# EXHIBIT B

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **Toni Chaves**<br>Plaintiff,<br><br>v.<br><br>**Cogent Medical Laboratory, LLC,**<br>Defendant | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CA Number: 5:19-cv-861-ESC |

**PLAINTIFF'S COUNSEL CHRIS R. MILTENBERGER'S DECLARATION IN SUPPORT OF ATTORNEYS' FEES AND EXHIBITS**

My name is Chris R. Miltenberger. I am a member in good standing of the bar of the State of Texas. I am counsel for Plaintiffs in the above-styled matter ("**Plaintiffs**"). I have personal knowledge of the facts contained herein, all of which are true and correct.

1. My firm (Law Office of Chris R. Miltenberger, PLLC) (the "**Miltenberger Firm**") represents Plaintiff in this action.

**Experience**

2. I am a licensed attorney practicing in the Dallas/Ft. Worth Metroplex area and am the founder of The Law Office of Chris R. Miltenberger, PLLC. Our law firm has two attorneys.

3. I am admitted to practice in Texas and in the following federal courts: United States Supreme Court, Fifth Circuit Court of Appeals, United States District

Courts for the Northern, Southern, Eastern and Western Districts of Texas, the United States District Court for the Northern District of Florida and the United States District Court for the District of Colorado. I regularly represent plaintiffs in FLSA overtime cases in federal courts throughout Texas.

4. I was admitted to the Texas bar in 1982. I have practiced largely in the area of employment law for 28 years of my 38-year legal career, including the areas of wage and hour violations. I was a partner in the Dallas-based law firm of Worsham, Forsythe & Wooldridge (now Hunton Andrews Kurth LLP) where my practice was focused on labor and employment law. My vitae is attached hereto as **Exhibit B-1**. I am a graduate of the University of Missouri – Columbia School of Law where I was a member of the Law Review. My firm is or has been involved in numerous cases complaining of illegal employment practices, many of which have been FLSA class or collective actions filed in courts across the United States and with plaintiffs located across the United States. Examples of recent FLSA cases I filed in the Western District[1] are:

a. *Joseph Hobbs, et. al. v. Petroplex Pipe and Construction, Inc.*; No.: 17-CV-00030-DC; United States District Court for the Western District of Texas (Midland/Odessa Division)(Plaintiffs' trial verdict affirmed on appeal, *Hobbs v. Petroplex Pipe and Construction, Inc.*, 946 F.3d 824, (5th Cir. 2020);

b. *Richard Eicher, individually and on behalf of all those similarly situated v. Baker Hughes Inc.*; No. 7:16-cv-72-RAJ-DC; United States District Court

[1] This list does not include numerous FLSA cases filed in the Northern, Eastern or Southern Districts of Texas.

for the Western District of Texas (Midland/Odessa Division)(filed as collective action, FLSA)(settlement);

c. *Daniel Ajayi, individually and on behalf of all others similarly situated v. Oil-Tech Construction, LLC;* No. 7:17-cv-228; United States District Court for the Western District of Texas (Midland/Odessa Division)(filed as collective action, FLSA)(settlement);

d. *Lupe Elizondo, individually and on behalf of all others similarly situated v. SA Family Help and Hope LLC;* No. 5:17-cv-0013-XR; United States District Court for the Western District of Texas (San Antonio Division)(filed as collective action, FLSA)(settlement); and

e. *Joanie Christa, individually and on behalf of all others similarly situated v. Manci Enterprises LLC;* No. 5:17-cv-00425-OLG; United States District Court for the Western District of Texas (San Antonio Division)(filed as collective action, FLSA)(settlement).

**5.** The second attorney working on this case, Rebecca K. Miltenberger, was admitted to the Texas bar in 1983. She has practiced in several areas of law during her legal career, including employment law for more than thirteen years of her career. Ms. Miltenberger has handled cases in minimum wage and overtime, discrimination, family medical leave and retaliation. Her vitae is attached hereto as **Exhibit B-2**. She is a graduate of the University of Missouri – Columbia School of Law where she was a member of the Order of the Coif and an editor of the Law Review.

**Description of Case and Specific Work Performed**

6. This case was filed on July 18, 2019 under the Fair Labor Standards Act ("**FLSA**") for unpaid overtime compensation. The parties consented to trial

before the Magistrate Judge. An Initial Pretrial Conference was held on October 25, 2019.

7. On October 10, 2019 I sent a subpoena to AT&T for records of phone calls Plaintiff received to her cell phone which were related to her work duties. The records were received and reviewed by me.

8. I sent written discovery to Defendant on October 29, 2019. The responses were received and reviewed by Plaintiff's counsel.

9. On January 22, 2020 Plaintiff filed an opposed motion to amend the complaint to add a cause of action for retaliation. The motion was granted.

10. The complaint was amended to add a claim for retaliation.

**Reasonable Rates**

11. A reasonable hourly fee in the Western District of Texas for a lead lawyer with similar experience and expertise to me is at least $375.00 per hour. My standard hourly rate is at least $525 per hour; I charge my fee-paying clients at least $525 per hour. Thus, the $375 per hour rate requested here is approximately 30 percent below my lowest rate charged my fee-paying clients.

12. A reasonable hourly fee in the Western District of Texas for a second lawyer with similar experience and expertise to Rebecca Miltenberger is at least $325.00 per hour and a reasonable hourly fee in the Western District of Texas for paralegals is at least $110.

13. I believe that our rates of $375.00 and $325.00 that we are charging for my services and Ms. Miltenberger's services in this case are below the market rate for attorneys with comparable expertise, experience and qualifications in the San Antonio area and are reasonable and appropriate in this case. In concluding that the rates set forth immediately above are reasonable in the San Antonio area I reviewed an extensive survey of attorneys' fee rate court rulings for employment cases in the Western District of Texas attached hereto as **Exhibit B-3** (see pages 20-24 thereof).[2] I also reviewed reported cases including a recent attorneys' fee ruling by this Court and Honorable Magistrate Judge in *West v. Zedric's LLC*, No. SA-19-CV-00556-FB, 2019 WL 6522828 (W.D. Tex. Dec. 3, 2019) and cases referenced therein.

14. I believe my credentials and experience justify an hourly rate greater than that approved for the lead attorney in *West*.

15. In preparing my fee petition in the *Joseph Hobbs, et. al. v. Petroplex Pipe and Construction, Inc.* I educated myself on rates charged in the Western District of Texas. I believe that the rates charged in San Antonio are greater than and at least equal to the rates in Midland. The 2015 State Bar survey shows a $258

---

[2] In concluding that the rates set forth immediately above are reasonable in the Western District of Texas, I did not rely on the State Bar Survey. For the reasons discussed in the report of Dr. Shirlene Pearson (attached hereto as **Exhibit B-4**), the State Bar Survey should be considered unreliable and should not be relied upon in awarding attorneys' fees. Instead, the survey setting forth rates awarded to plaintiffs' attorneys in specific employment cases is a more reliable source and is the source which I reviewed and upon which I partially relied.

median hourly rate for San Antonio and a $225 medial hourly rate for West Texas for the labor and employment field.

16. Thus, Plaintiff is requesting the same hourly rates recently approved by Judge Counts in the contested case of *Hobbs*, $375 for Mr. Miltenberger and $325 for Ms. Miltenberger. A copy of Judge Count's decision and discussion of the hourly rate is attached as an exhibit. **Exhibit B-5**.

**Time Keeping Process**

17. The Miltenberger Firm performed the services on the dates for the time indicated in the time records attached hereto as **Exhibit B-6.** The specific work performed by the Miltenberger Firm in prosecuting this action is detailed in the time entries attached to this declaration. It is Miltenberger Firm's practice to maintain contemporaneous time records setting forth the amount of time spent working on each case with descriptions regarding the actual task involved. My usual practice, and the usual practice of Ms. Miltenberger is to record only those hours that the Miltenberger Firm would customarily bill to a client paying on an hourly basis.

18. Ms. Miltenberger and I also exercised billing judgment before recording time to eliminate time for duplicative or redundant tasks or to reduce time for work that may have been inefficient, unproductive or excessive.

19. To the extent I could assign work to Ms. Miltenberger, who has a lower billable rate than I, to perform particular tasks, I exercised billing judgment and did so.

20. In my exercise of billing judgment, I have reviewed the billing records maintained in this case and am satisfied that the amount of time billed to specific tasks, and the amount spent on the case overall, is reasonable and not excessive in light of the issues in the case.

**Lodestar**

21. Through June 26, 2020, the Miltenberger Firm spent a total of 47.3 hours on this matter. The hours expended are as follows:

| Timekeeper | Number of Hours | Hourly Rate | Lodestar Amount |
|---|---|---|---|
| Chris Miltenberger | 9 | $375 | $3,375.00 |
| Rebecca Miltenberger | 38.3 | $320 | $12,447.50 |
| **Total** | **47.3** | | **$15,822.50** |

22. The Miltenberger Firm's lodestar (hours x hourly rates) on the hours expended through June 26, 2020, amounts to $15,822.50. I certify that the hours claimed here for myself and Ms. Miltenberger are well grounded in fact and justified and that they were actually expended on the topics stated. Further, I certify that hours expended and the rates claimed are reasonable in this instance.

## Costs and Expenses

23. Reasonable and necessary expenses incurred in addition to the lodestar amount of the attorneys' fees are $465.00. **Exhibit B-7.** The expenses are the filing fee ($400.00) and a private process service fee at the rate equal to that charged by the United States Marshal ($65.00). *See West v. Zedric's LLC*, No. SA-19-CV-00556-FB, 2019 WL 6522828 (W.D. Tex. Dec. 3, 2019.

24. Attached as an **Exhibit B-8** to this declaration is the certification from AT&T regarding documents it produced in response to a subpoena in this case. The document attached as Exhibit A-4 to the declaration of Plaintiff was produced by AT&T and covered by AT&T certification.

25. Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on 6/26/2020.

DocuSigned by:
Chris Miltenberger
2D8CD59D2BAF40C

Chris R. Miltenberger
Attorney for Plaintiff

# EXHIBIT B-1

**CHRIS R. MILTENBERGER**
1360 N. White Chapel, Suite 200, Southlake, Texas 76092
(817) 416-5060 chris@crmlawpractice.com

---

**Law Firm Affiliation**

THE LAW OFFICE OF CHRIS R. MILTENBERGER, PLLC — July 2012 - Present
- Founder

MILTENBERGER LAW FIRM — Sept. 2005 – April 2008
- Of Counsel

WORSHAM, FORSYTHE & WOOLDRIDGE, L.L.P. (now Hunton & Williams, L.L.P.) — 1982-1998
- Partner — 1990-1998
- Associate — 1982-1990

---

**Executive Management/In-House Counsel Employment**

GEOS COMMUNICATIONS, INC./D MOBILE, INC.
- President, Geos Communications (OTCBB: GCMI) — Aug. 2008 – Jul 2012
- Executive Vice President - Legal Counsel, HR and IT, D Mobile — Aug. 2010 – July 2012

RESOURCE CONCEPTS, INC.
- President and Legal Counsel — 1998 - 2004

---

**Current Practice**

REPRESENTATION OF EMPLOYEES – 2012 TO PRESENT

- Practice currently involves the representation of employees in wage and hour issues, all manner of discrimination and sex harassment lawsuits, including hostile work environment cases, religion and disability discrimination cases.

- Representation of consumers under the Telephone Consumer Protection Act and the Fair Credit Reporting Act.

- Practice involves cases in both federal and state courts. Represents individuals on a contingency fee basis.

---

## PREVIOUS LABOR AND EMPLOYMENT EXPERIENCE

- Practice in the labor and employment area has involved counseling employers on all aspects of the employer-employee relationship including handling matters in federal and state court, arbitration and administrative forums. Represented clients ranging from companies with only a few employees to Texas Utilities, a then public utility with over 10,000 employees. Advised companies employing both union and non-union workers.

## PREVIOUS ARBITRATION AND ALTERNATIVE DISPUTE RESOLUTION EXPERIENCE

- Represented management in over 50 labor arbitration hearings, 39 as lead counsel and 11 as second chair:
    - Prepared grievance answers, researched and selected neutral third-party arbitrators, interviewed witnesses, prepared testimony and witnesses, presented testimony and documentation to the arbitrator and wrote post-hearing arbitration briefs.

---

**Education and Bar Membership**

UNIVERSITY OF MISSOURI – COLUMBIA SCHOOL OF LAW — Juris Doctorate, 1982
- Missouri Law Review
- Teaching Assistant, Business Law

SOUTHEAST MISSOURI STATE UNIVERSITY — 1978
- Bachelor of Arts – Accounting and Economics, *Cum Laude*

TEXAS BAR ASSOCIATION, Member — 1982 to present
UNITED STATES SUPREME COURT, Member
5TH CIRCUIT COURT OF APPEALS, Member
NORTHERN DISTRICT OF TEXAS, Member
EASTERN DISTRICT OF TEXAS, Member
SOUTHERN DISTRICT OF TEXAS, Member
WESTERN DISTRICT OF TEXAS, Member
NORTHERN DISTRICT OF FLORIDA, Member
DISTRICT OF COLORADO, Member

ASSN. OF TECHNOLOGY LAW PROFESSIONALS, Member — 2010 to present

# EXHIBIT B-2

***REBECCA K. MILTENBERGER***
1360 N. White Chapel, Suite 200
Southlake, TX 76092
**Office: (817)416-5060**
**Mobile: (817) 291-5410**
**rkmilt@crmlawpractice.com**
Member: State Bar of Texas

## LEGAL EMPLOYMENT

**The Law Office of Chris R. Miltenberger, PLLC**
***Contract Attorney,*** 2013-Present
***Areas of Practice:*** Employment Law; Employment Litigation; Business Organizations; Business Contract Review, Drafting and Negotiation; General Administrative Litigation; Consumer Litigation; Education Law

**The Miltenberger Law Firm, PLLC**
***Contract Attorney,*** 2008-2009, 2012
***Areas of Practice:*** Business Organizations; Business Contract Review, Drafting and Negotiation; Employment Law; Products Liability; Insurance Defense; General Administrative Litigation; Education Law

**Henslee, Fowler, Hepworth & Schwartz, LLP (now Henslee Schwartz LLP)**
***Contract Attorney,*** 2005-2008
***Areas of Practice:*** Education Law representing Texas Public School Districts in matters of Employment Law, Business Transactions and Business Contracts involving School Districts, Special Education Law, Student Discipline and Student Rights, and Board Governance

**Jackson, Walker, Winstead, Cantwell & Miller (now Jackson Walker L.L.P)**
***Associate,*** 1983-1987
***Areas of Practice*:** Corporate Securities; ERISA; General Corporate (including small business corporate structures and contract review, drafting and negotiation)

## EDUCATION

**Juris Doctorate: *Order of the Coif*, University of Missouri – Columbia, 1983;**
**Missouri Law Review - Note & Comment Editor**
**B.F.A. Music:** University of Missouri – Columbia, 1980
**A.A. Music:** Stephens College - 1977

## PUBLIC OFFICE

**Carroll Independent School District Board of Trustees,** 2000-2004
***Vice President*,** 2002-04
***Member,*** 2000-04
***Chairman,*** Academic Co-Curricular Enhancement Committee, 2001-04; Technology

Committee, 2001-02

***Member,*** District Advisory Committee, Drug and Alcohol Awareness Committee, Title IX Review Committee, Texas Association of School Boards General Assembly

## LEGAL EXPERIENCE

**CURRENT: Employment Law and Consumer Protection Law**

- Advises clients regarding compliance with and violations of federal and state employment law as it applies to public and private employees regarding discrimination, retaliation, overtime and minimum wage, and medical leave (specifically with regard to issues arising under the FLSA, FLMA, ADA, ADEA and Title VII)
- Advises clients regarding compliance with and violation of federal and state employment law as it applies to contract and at-will employees (specifically with regard to issues arising under the ADA, ADEA, FLSA, FMLA and Title VII)
- Negotiates, drafts, revises and interprets employment contracts for private employees and for public employees within the administrative and legal framework governing such public and private employees
- Advises consumers under the Telephone Consumer Protection Act and the Fair Credit Reporting Act.

**CURRENT: Employment Litigation and Consumer Protection Litigation**

- Drafts pleadings of clients in all areas of employment litigation, including litigation involving discrimination, retaliation, overtime and minimum wage, medical leave, and employment contract breaches
- Drafts pleadings of clients in all areas of consumer protection litigation
- Conducts discovery for clients in above described litigation
- Conducts research and drafts motions and briefs in above described litigation, including motions involved in discovery conflicts and any and all dispositive motions and briefs therefore

**PAST: Tort Litigation**

- Drafted pleadings in the defense of clients in mass toxic tort litigation
- Conducted discovery for clients in mass tort litigation
- Drafted motions and briefs in the defense of clients in complex tort litigation

**CURRENT AND PAST: Corporate and ERISA**

- Reviews, drafts, negotiates and executes service agreements, purchase and sales contracts, and various other agreements for corporate clients
- Advises business clients in matters of business organization and administrative and regulatory requirements
- Incorporates private corporations, forms limited partnerships and drafts stock purchase and other agreements for business clients
- Drafted and executed SEC documents and performed due diligence for several public stock offerings
- Drafted and executed private stock offering documents and closing documents related thereto

- Advised corporate clients regarding various ERISA issues

**CURRENT AND PAST: Education Law**

- Advises clients regarding compliance with federal and state employment law as it applies to Chapter 21 and at-will employees (specifically with regard to issues arising under the ADA, ADEA, FLSA, FMLA and Title VII)
- Advises clients in the areas of student discipline and student rights (specifically with regard to issues arising under the TEC, Title IX and federal and state constitutional law)
- Negotiated, drafted and revised contracts for service agreements, purchase and sales, facility lease and use and employment within the administrative framework governing Texas school districts
- Represented clients in student and employee grievance procedures and hearings
- Assisted in representation of clients in administrative hearings and mediations under the IDEA and Section 504
- Advised clients regarding compliance issues under the IDEA and Section 504
- Advised clients in the area of board and administrative governance with respect to grievance procedures, parliamentary procedures and OMA, PIA, TEC, TLGC and TGC compliance

**EXPERIENCE IN PUBLIC OFFICE**

- Over a four year period made nine million dollars in budget cuts resulting in facility closures and reductions in force of more than 100 employees
- Heard and ruled upon several employee and public grievances, including grievances involving employment issues, student and parental rights and student discipline
- Developed Title IX Review Committee to perform a self-evaluation of CISD's compliance
- Presided over a policy audit, more than seven major policy updates and the institution of regulations to standardize travel, expenditures, fees and facility use
- Assisted in development of CISD's Dyslexia Program and CARE Reading Program to meet state and federal requirements for the adequate education of students with dyslexia and related disorders
- Reviewed state guidelines for talented and gifted students and chaired committee recommending changes in CISD's program
- Reviewed recent developments in student drug testing and reported such developments to appropriate committee for action

**TRAINING IN ALTERNATIVE DISPUTE RESOLUTION**

- **University of Texas- Arlington - Division for Enterprise Development**- Certificate of Completion of Basic Mediation Training (Meeting the Standards of the TMTR and the requirements of Section 154.052(a) of the Texas Civil Practice and Remedies Code)(2011)
- **University of Texas- Arlington - Division for Enterprise Development** - Certificate of Completion of Mediation in the Employment Sector: Workplace Conflict (2011)
- **University of Texas- Arlington - Division for Enterprise Development** - Certificate of Completion of Advanced Family Law and Mediation (Meeting the Standards of the TMTR and the requirements of 154.052(b) of the Texas Civil Practice and Remedies Code)(2011)

# EXHIBIT B-3

**ATTORNEYS' FEE RATE RULINGS: EMPLOYMENT CASES IN TEXAS**

| Adjusted* Hourly Rate | Hourly Rate Approved | JD Year | Attorney | Ruling Date | Case and Judge |
|---|---|---|---|---|---|
| **West Texas** | | | | | |
| $891.31 | $750 | 1979 | Ricardo G. Cedillo | 04/10/12 | *Barrera v. MTC, Inc.*, No. 5:10-cv-00665 [Doc. 77] (W.D. Tex. San Antonio) (Judge Xavier Rodriguez) (adopting fees requested in Doc. 73). |
| $473.71 | $425 | 2004 | Rachhana T. Srey | 11/10/15 | *Clark v. Centene Corp.*, No. 1:12-cv-00174-SS [Doc. 180] (W.D. Tex. Austin) (Judge Sam Sparks) |
| $473.71 | $425 | 1991 | Paul J. Lukas | 11/10/15 | *Clark v. Centene Corp.*, No. 1:12-cv-00174-SS [Doc. 180] (W.D. Tex. Austin) (Judge Sam Sparks) |
| $469.42 | $395 | 1993 | Ramon Bissmeyer | 04/10/12 | *Barrera v. MTC, Inc.*, No. 5:10-cv-00665 [Doc. 77] (W.D. Tex. San Antonio) (Judge Xavier Rodriguez) (adopting fees requested in Doc. 73). |
| $452.94 | $400 | 1993 | Douglas Welmaker | 10/08/14 | *Meesook v. Grey Canyon Family Medicine, P.A.*, No. 5:13-cv-729-XR [Doc. 39], 2014 WL 5040133 (W.D. Tex. San Antonio) (Judge Xavier Rodriguez) |
| $431.29 | $400 | 1978 | B. Craig Deats | 04/29/16 | *Vigil v. City of Austin, Texas*, Cause No. D-1-GN-13-001742 (200th Judicial District Court for Travis County, Texas) (Judge Karin Crump) |

* Adjusted for inflation from the year the court ruled the rate to be reasonable to the end of 2018 using the Consumer Price Index for Legal Services as generated by the United States Bureau for Labor Statistics: https://www.officialdata.org/Legal-services/price-inflation

**ATTORNEYS' FEE RATE RULINGS: EMPLOYMENT CASES IN TEXAS**

| Adjusted* Hourly Rate | Hourly Rate Approved | JD Year | Attorney | Ruling Date | Case and Judge |
|---|---|---|---|---|---|
| $425.00 | $425 | 1993 | Holly B. Williams | 06/22/18 | *Roberts v. Brinkerhoff Inspection, Inc.*, No. 7:16-cv-00342 [Doc. 86] (W.D. Tex. Midland) (Judge David Counts) (adopting fees requested in Doc. 80) |
| $390.11 | $350 | 1995 | J. Derek Braziel | 12/08/15 | *Rodriguez v. Mechanical Tech. Servs., Inc.*, No. 1:12-cv-00710 [Doc. 175] (W.D. Tex. Austin) (Judge David Ezra) |
| $390.11 | $350 | 1979 | Oscar H. Villareal | 06/11/15 | *Alonzo-Miranda v. Schlumberger Tech. Corp.*, No. 5:13-cv-01057-RCL [Doc. 172] (W.D. Tex. San Antonio) (Judge Royce Lamberth) |
| $388.98 | $300 | 1993 | John A. Wenke | 12/21/09 | *Jackson v. Host Int'l*, No. 3:08-cv-00112 [No. 101] (W.D. Tex. El Paso) (Judge Frank Montalvo) |
| $386.23 | $325 | 1997 | Edmond Moreland | 05/09/12 | *Ransom v. M. Patel Enters., Inc.*, No. 1:10-cv-00857 [Doc. 194] (W.D. Tex. Austin) (Magistrate Judge Andrew Austin), *reversed on other grounds* 734 F.3d 377 (5th Cir. 2013) |
| $377.38 | $350 | 1996 | Robert Notzon | 03/15/16 | *Saldivar v. Austin Indep. Sch. Dist.*, No. 14-CA-00117 [Doc. 97 ] (W.D. Tex. Austin) (Judge Sam Sparks) |

* Adjusted for inflation from the year the court ruled the rate to be reasonable to the end of 2018 using the Consumer Price Index for Legal Services as generated by the United States Bureau for Labor Statistics: https://www.officialdata.org/Legal-services/price-inflation

**ATTORNEYS' FEE RATE RULINGS: EMPLOYMENT CASES IN TEXAS**

| Adjusted* Hourly Rate | Hourly Rate Approved | JD Year | Attorney | Ruling Date | Case and Judge |
|---|---|---|---|---|---|
| $375.89 | $325 | 1993 | Holly B. Williams | 07/09/13 | *Ibarra v. United Parcel Service, Inc.*, No. 7:10-cv-00113 [Doc. 147] (W.D. Tex. Midland) (Judge Harry Hudspeth) |
| $334.38 | $300 | 2006 | Meredith Matthews | 12/08/15 | *Rodriguez v. Mechanical Tech. Servs., Inc.*, No. 1:12-cv-00710 [Doc. 175] (W.D. Tex. Austin) (Judge David Ezra) |
| $323.47 | $300 | 2008 | Aaron Johnson | 06/13/16 | *Mohammadi v. Nwabuisi*, No. 5:12-cv-00042 [Doc. 148] (W.D. Tex. San Antonio) (Judge Robert Pitman) |
| $323.47 | $300 | 2007 | Manuel Quinto-Pozos | 04/29/16 | *Vigil v. City of Austin, Texas*, Cause No. D-1-GN-13-001742 (200th Judicial District Court for Travis County, Texas) (Judge Karin Crump) |
| $323.47 | $300 | 2006 | Matt Bachop | 04/29/16 | *Vigil v. City of Austin, Texas*, Cause No. D-1-GN-13-001742 (200th Judicial District Court for Travis County, Texas) (Judge Karin Crump) |
| $323.24 | $290 | 2008 | Aaron Johnson | 12/08/15 | *Rodriguez v. Mechanical Tech. Servs., Inc.*, No. 1:12-cv-00710 [Doc. 175] (W.D. Tex. Austin) (Judge David Ezra) |
| $306.52 | $275 | 2009 | Chris Willett | 12/08/15 | *Rodriguez v. Mechanical Tech. Servs., Inc.*, No. 1:12-cv-00710 [Doc. 175] (W.D. Tex. Austin) (Judge David Ezra) |

* Adjusted for inflation from the year the court ruled the rate to be reasonable to the end of 2018 using the Consumer Price Index for Legal Services as generated by the United States Bureau for Labor Statistics: https://www.officialdata.org/Legal-services/price-inflation

**ATTORNEYS' FEE RATE RULINGS: EMPLOYMENT CASES IN TEXAS**

| Adjusted* Hourly Rate | Hourly Rate Approved | JD Year | Attorney | Ruling Date | Case and Judge |
|---|---|---|---|---|---|
| $306.52 | $275 | 2009 | Alexander Baggio | 11/10/15 | *Clark v. Centene Corp.*, No. 1:12-cv-00174-SS [Doc. 180] (W.D. Tex. Austin) (Judge Sam Sparks) |
| $301.90 | $280 | 2010 | Philip J. Moss | 06/13/16 | *Mohammadi v. Nwabuisi*, No. 5:12-cv-00042 [Doc. 148] (W.D. Tex. San Antonio) (Judge Robert Pitman) |
| $283.08 | $250 | 2011 | Michael L. Parsons | 10/08/14 | *Meesook v. Grey Canyon Family Medicine, P.A.*, No. 5:13-cv-729-XR [Doc. 39], 2014 WL 5040133 (W.D. Tex. San Antonio) (Judge Xavier Rodriguez) |
| $250.79 | $225 | 2013 | Jay Forester | 12/08/15 | *Rodriguez v. Mechanical Tech. Servs., Inc.*, No. 1:12-cv-00710 [Doc. 175] (W.D. Tex. Austin) (Judge David Ezra) |

* Adjusted for inflation from the year the court ruled the rate to be reasonable to the end of 2018 using the Consumer Price Index for Legal Services as generated by the United States Bureau for Labor Statistics: https://www.officialdata.org/Legal-services/price-inflation

# EXHIBIT B-4

# Review of the State Bar of Texas *2015 Hourly Fact Sheet* report and its Use by Texas Judiciary in Deciding Plaintiff Attorney Hourly Fees in Labor-Employment Cases[1]

N. Shirlene Pearson, Ph.D.[2]
*Pearson Statistical Consulting & Expert Testimony*
28601 Los Alisos Blvd #2075
Mission Viejo, CA 92692-7920
214-597-1267
shirlene.pearson@msn.com
*statisticalexpert.com*

The State Bar of Texas publishes the results of a survey of Texas attorneys (“Attorney Survey”), conducted every two years, that is used to generate the *Hourly Fact Sheet* report. This report focuses on attorney hourly rates charged in the preceding year and, where possible, compares these rates with those of the previous survey. Thus, the 2015 survey results are compared with the 2013 survey results. A copy of the questionnaire is included in the 2015 report, which was published in August 2016. In Texas, these results are often used to determine allowable rates that plaintiff attorneys, retained on a contingency basis, can charge in Labor-Employment cases heard within the state of Texas, so it is of interest to the Texas Labor-Employment plaintiff attorney community to ensure that the best possible resources are being used for these determinations. The report contained herein provides a review of the *2015 Hourly Rate Sheet* and the Attorney Survey as to their relevance and usefulness for use in setting contingency-based plaintiff attorney fees in Texas Labor-Employment cases.

Review of the State Bar of Texas *2015 Hourly Fact Sheet* report and its use by Texas judiciary in deciding contingency-based plaintiff attorney hourly fees in Labor-Employment cases uncovered some problematic areas that are the focus of this report. Based on the findings in this review, I recommend that no reliance should be made on the Attorney Survey nor the *Hourly Fact Sheet* report, as currently being conducted, when deciding allowable fees that plaintiff attorneys can charge in Labor-Employment cases.

---

[1] This work was commissioned by the Texas Employment Lawyers Association.

[2] N. Shirlene Pearson earned her Ph.D. in statistics from Southern Methodist University (SMU) in 1979, and has worked as a professional statistician in both industry and academia since graduation. She also earned an M.S. in statistics from SMU, an M.A. and B.A. in mathematics from the University of Texas at Austin. She has been employed at Bell Telephone Laboratories, Bell Communications Research, the Applied Research Laboratories at the University of Texas at Austin, MCI Communications/WorldCom, and SMU. She was a District Manager at Bell Communications Research and a Branch Manager at the Applied Research Laboratories. She joined Southern Methodist University as Director of the Center for Statistical Consulting and Research in 1999, and transferred to the Academic Technology Services group in 2006, then to SMU’s Center for Teaching Excellence. She retired from SMU in February 2015, but continued working at SMU as a consultant supporting the university assessment process and as an Adjunct Faculty in the Department of Statistical Sciences. She is retiring as Adjunct Faculty at SMU in December 2016 to focus entirely on her consulting activities. Dr. Pearson has written numerous technical reports, legal reports, and articles in which her use of statistical methodology was an instrumental component.

The Attorney Survey is sent to all Texas attorneys who are members of the Texas State Bar and who did not opt out of receiving emails containing the survey. Emails with the 2015 survey were sent to 94,150 attorneys, of which 11,793 responded in part or in whole. The *Hourly Fact Sheet* (hereafter "Report") states the response rate to be 12.5 percent (11,793/94,150). However, the Report only uses the data of those respondents who were employed full time as licensed and practicing attorneys (4,260, which is less than half of the total respondents); so, the stated response rate might not accurately reflect the response rate of those being analyzed in the Report, since it is (apparently) unknown as to how many of the 94,150 surveyed were full-time attorneys. No discussion of this dilemma is presented in the report. Because no breakdown by practice area is given of these recipients in the Report, it is not possible for the reader to determine what the response rate was for Labor-Employment attorneys. Survey response rates are an important factor in assessing the reliability of the results. A survey response rate of 30% is, in most cases, considered more reliable than a response rate of 10%, and 10% is better than 5%, given the same survey distribution conditions.

While there is no universally accepted standard on what is an acceptable response rate to a survey, it is my expert opinion that a response of 25% is not unusual without follow-up contact, but is too low to guard against selection bias issues. Certainly, a response rate of 12.5% leaves much room for improvement and is not "good."

A study of response rates in surveys conducted by The Tavistock Institute of institutional research[3] found the following:

> This study examines the response rates for surveys used in organizational research. We analyzed 1607 studies published in the years 2000 and 2005 in 17 refereed academic journals, and we identified 490 different studies that utilized surveys. We examined the response rates in these studies, which covered more than 100,000 organizations and 400,000 individual respondents. The average response rate for studies that utilized data collected from individuals was 52.7 percent with a standard deviation of 20.4, while the average response rate for studies that utilized data collected from organizations was 35.7 percent with a standard deviation of 18.8. Key insights from further analysis include relative stability in response rates in the past decade and higher response rates for journals published in the USA. The use of incentives was not found to be related to response rates and, for studies of organizations, the use of reminders was associated with lower response rates. Also, electronic data collection efforts (e.g. email, phone, web) resulted in response rates as high as or higher than traditional mail methodology.

The Attorney Survey is a *self-selecting* survey. That is, the recipients decide whether or not to participate. Surveys of this type are known to suffer from selection bias (lack of representativeness of the population of interest),[4] the extent of which is almost always unmeasurable. This means that the group who respond may differ from those who did not in important characteristics that can influence

---

[3] Yahuda Baruch and Brooks C. Holtom (2008). Survey response rate levels and trends in organizational research. Human Relations. *Sage Publications*, Vol. 61, Issue 8, 1139-1160.

[4] Yasser Khazaal, MD, corresponding Yasser Khazaal, MD Mathias van Singer, Anne Chatton, MA, Sophia Achab, MD, PhD, Daniele Zullino, MD, Stephane Rothen, PhD, Riaz Khan, MD, Joel Billieux, PhD, and Gabriel Thorens, MD. (2014). Does Self-Selection Affect Samples' Representativeness in Online Surveys? An Investigation in Online Video Game Research. *J Med Internet Res.*, 16(7): e164. (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4115258/)

and skew the results. It is almost always impossible for those conducting self-selection surveys to determine these differentiating characteristics, so the effect of selection bias on the results can rarely be determined. This is of particular concern in surveys in which some (but not all) recipients have a vested interest in the outcomes. Such surveys tend to have a greater response rate from those interested in the results than those who have little or no interest unless participation is enforced.

A survey researcher in the pharmaceutical arena suggests a response rate of at least 50-60% to best for minimizing selection bias issues:

> Nonresponse error, or bias, occurs if data are not collected from each member of the sample. Nonresponse bias theoretically can occur with anything less than a 100% response rate. A response rate of 50%-60% or greater is optimal because nonresponse bias is thought to be minimal with that high of a response rate.[5] If the response rate is too low, those who responded have a greater chance of being self-selected (i.e., there is something inherently different about those who responded and those who did not respond), and thus not representative of the target population. Nonresponse bias can lead to inaccurate conclusions if data from the non-respondents would have changed the overall results of the survey.

Recommended response rates found at a University of Texas website

https://facultyinnovate.utexas.edu/sites/default/files/response_rates.pdf

are given as

> Acceptable response rates vary by how the survey is administered:
>
> - Mail: 50% adequate, 60% good, 70% very good
> - Phone: 80% good
> - Email: 40% average, 50% good, 60% very good
> - Online: 30% average
> - Classroom paper: > 50% = good
> - Face-to-face: 80-85% good

Selection bias is further exacerbated when the self-selection survey contains questions that are of a sensitive nature, which the Attorney Survey does. Response rates, as well as the quality of the answers, for self-selection surveys with sensitive questions suffer unless the recipients are convinced of complete anonymity. The *2015 Hour Rate Sheet* does not provide information to suggest that this is the case with the Attorney Survey nor does the survey itself describe measures to ensure anonymity. Some examples of sensitive questions in this survey are:

1. What was your approximate gross personal income (including any bonus) during calendar year 2015?
2. If you received a bonus, what was it?

[5] Fincham JE. (2008) Response rates and responsiveness for surveys, standards, and the Journal. *Am J Pharm Educ.*, 72:Article 43.

3. Which of the following best describes your class rank upon graduation from college?
4. Which of the following best describes your class rank upon graduation from law school?

Many self-selecting recipients may either not respond to surveys with sensitive questions, skip those questions (if the survey allows), or perhaps embellish upon the answers they give. Tourangeau and Yan discuss their study of these three important consequences of asking sensitive questions[6]:

> Sensitive questions are thought to affect three important survey outcomes: (a) overall, or unit, response rates (that is, the percentage of sample members who take part in the survey), (b) item nonresponse rates (the percentage of respondents who agree to participate in the survey but who decline to respond to a particular item), (c) and response accuracy (the percentage of respondents who answer the questions truthfully). Sensitive questions are suspected of causing problems on all three fronts, lowering overall and item response rates and reducing accuracy as well.

Surveys administered via email suffer from another form of selection bias unique to email, that being spam and junk email filters. This survey was sent to a very large number of recipients, but no discussion in the report is given about measures, if any, taken to mitigate problems associated with spam filtering, which can occur at both the computer email server level and the individual user level. Much depends on how the survey is distributed. Because law firms and individual attorneys may have differing levels of filters on their email, the probabilistic nature (randomness) of the survey responses is perturbated. Without proper randomization of the responses, no statistically valid analysis can be performed on the data, including summary reports.

Inspection of the table of *Hourly Rate by Practice Area by Geographic Region* suggests that the sample size may be too small to provide adequate coverage of all geographic regions and practice areas. Empty cells in this table indicate that there were 5 or fewer responses (see page ii, paragraph 4). Response rates within cells are not provided nor are given measures of variability, so the reader is left uncertain as to the meaningfulness of these numbers. Six of the practice areas have no entries in the table for any of the regions, others have many empty cells or frequencies that seem low. Again, without knowing the within cell response rates, it is impossible to ascertain the reliability of these numbers. While this table may be useful for other purposes, it is inadequate for use in determining fee rates in actual cases.

Although asked to provide positional information in the Attorney Survey, the *2015 Hourly Rate Sheet* does not provide any information broken down by position categories. When setting fee rates, it would be useful to have this breakdown.

Some of the questions in the survey are ambiguous leading to results whose interpretation may not reflect the reality of the answers. Questions regarding hourly rates charged do not ask whether the rates listed by respondents are real rates or volume discounts. It is plausible that within firms offering volume discounts to certain clients, some attorneys may quote real (undiscounted) rates and others discounted rates, while others may use some combination of the two. This survey does not ask whether rates had changed during the year, that is, they are not asked to state the rate at a specific point(s) in time. Thus, some attorneys may quote the year-end rate, while others may estimate an overall rate taking into

---

[6] Roger Tourangeau and Ting Yan (2007). Sensitive Questions in Surveys. *Psychological Bulletin*, Vol. 133, No. 5, 859-883.

account different rates during the year. These issues can produce misleading and inaccurate hourly-rate estimates.

The *2015 Hourly Rate Sheet* calculates the percent change in medians by a very simple method:

(2015 Median – 2013 Median)/2013 Median = 7.4%

This calculation is not the appropriate method for this application, as it is likely mixing apples with oranges. The mix of individuals in the 2015 survey is not be the same as the mix in the 2013 survey, so this method for calculation the percent increase in medians is biased. It is easy to see that the mix of individuals is different because of the different sample sizes in the two years. There were 4,951 respondents in 2013 and 4,260 in 2015. Some individuals in the 2013 survey clearly did not respond to the 2015 survey. It's probably a good guess that some of the respondents in 2015 did not take the 2013 survey. Consider a worst-case scenario in which the two groups have no overlap, that is, none of those who took the 2013 survey responded to the 2015 survey. Since we do not know what the median rate was in 2013 for those who took the 2015 survey, it is unreasonable to assume that it must be the same as the 2013 group (and vice versa). The proper way to calculate this estimate is to use only those respondents who appear in both the 2013 and the 2015 surveys. If there is little or no overlap between the two groups, then a reliable estimate cannot be calculated and should be reported as such.

Using the rates in the *Hourly Rate Sheet* report with no adjustments for changes that may have taken place since the survey was administered may be disadvantaging plaintiff attorneys who practice Labor-Employment Law in Texas and who are retained on a contingency basis. The Attorney Survey does not ask certain questions that are needed to fairly determine the fees that these attorneys may charge, such as whether the respondent works on a contingency or an hourly basis in Labor-Employment practice or what plans may be for future changes in fees. The Report itself does not provide projections on rate changes, which would be needed for each of the two years into the future to be of direct use in deciding allowable fees that Labor-Employment contingency-based plaintiff attorneys may charge.

The subsample of Labor-Employment attorney respondents in the Attorney Survey is a confounded mixture of plaintiff attorneys who are retained on a contingency basis and defense and plaintiff attorneys retained on an hourly basis. Fees for plaintiff attorneys working on a contingency basis ideally should be based on responses from attorneys who are not retained on a contingency basis. To see why this may cause an unfair treatment of contingency-based plaintiff attorneys, consider the simple scenario where half the respondents in 2013 are contingency-based plaintiff and half are hourly-based attorneys. Further assume that all charge $300 per hour in 2013. Using the 7.4% rate increase estimated in the Report, the hourly-based attorneys will be charging about $322 in 2015. Without adjustment for changes over time, the contingency-based plaintiff attorneys will be allowed only $300 per hour in 2015 and a major part of 2016 (recall that the Report for 2015 was not published until August 2016). Then in the 2015 report, the median will be given to be $311 per hour. Between August 2016 and (August) 2018, contingency-based plaintiff attorneys will be allowed to charge $311 per hour, but in 2017 the hourly-based attorneys will be charging $346 (and between then and when the report is published may be charging even more) per hour. With passage of time, the gap will widen. If most of the Labor-Employment respondents are contingency-based plaintiff attorneys, then the disadvantage will be greater. Again, setting of the hourly rates that Labor-Employment contingency-based plaintiff attorneys can charge should be based on fee structures of Labor-Employment hourly-based attorneys only.

Again, based on the findings in this review, I recommend that no reliance should be made on the Attorney Survey nor the *Hourly Fact Sheet* report, as currently being conducted, when deciding allowable fees that contingency-based plaintiff attorneys can charge in Labor-Employment cases. The response rates in the Attorney Survey, upon which the *Hourly Fact Sheet* is based, are unacceptably low, the survey includes sensitive questions and the calculations in the *Hourly Report* are not based on accurate methods. I also recommend that adjustments to the rates over time should be made, but these resources provide no guidance on how the adjustments should made, so additionally references may be needed for this purpose.

**N. Shirlene Pearson, Ph.D.**
*Pearson Statistical Consulting & Expert Testimony*
28601 Los Alisos Blvd #2075
Mission Viejo, CA 92692-7920
*(214) 597-1267*
*shirlene.pearson@msn.com*
*http://statisticalexpert.com*

## Education

| | | | | |
|---|---|---|---|---|
| Ph.D. | Statistics | Southern Methodist University | Dallas, TX | 1979 |
| M.S. | Statistics | Southern Methodist University | Dallas, TX | 1975 |
| M.A. | Mathematics | The University of Texas at Austin | Austin, TX | 1973 |
| B.A. | Mathematics | The University of Texas at Austin | Austin, TX | 1971 |

PhD Dissertation: Time Series Analysis, MA Thesis: Algebra,
BA Minor: Biology, BA Minor: Chemistry

## Teaching Experience

Statistics 5304 – Statistical Computing (in SAS)
Statistics 6366 – Statistical Consulting
Statistics 2301 – Statistics for Modern Business Decisions
Statistics 2331 – Introduction to Statistical Methods
SPSS Workshops

## Professional Affiliations and Activities

Member at Large, Section on Statistical Consulting, 2006-2008 Annual Joint Statistical Meetings
Program Chair, Section on Statistical Consulting, 2004 Annual Joint Statistical Meetings
Session Chair, Section on Statistical Consulting, 2004 Annual Joint Statistical Meetings
Session Chair, Section on Statistical Consulting, 2003 Annual Joint Statistical Meetings
President, North Texas Chapter, American Statistical Association (2000-2001)
Vice President and Program Chair, North Texas Chapter, American Statistical Association (1999-2000)
American Statistical Association
Managing Editor, *Selected Tables in Mathematical Statistics* (1983-1990)
Editorial Board, *Selected Tables in Mathematical Statistics* (1974-1990)

**Honorary** - *Sigma Xi, the Scientific Research Society of North America; American Statistical Association Long-Time Member*

**Statistical Consulting Experience (selected examples)**

*Expert Testimony, Litigation and Legal Support* – review and analysis of tribal claims against the United States of America; analysis of grading system in use for determining first-year students retention at a major law school in Texas, evaluation of survey-based reports issued by the Texas State Bar Assocation, insurance fraud, employment discrimination, inventory disputes between companies, contract disputes between companies, medical malpractice, criminal probability modeling, sampling and extrapolation for cases involving audits, election fraud; *Education*- analyze library training data of students at twelve major universities and merge into a single report of its effect on student retention and academic success; statistical support for SMU's university curriculum course-level assessments; assisted with exit survey of graduates to assess student satisfaction with curriculum and experiences while attending SMU's Meadows School of Fine Arts; responsible for SMU's online course evaluation reports and analyses of response data; study comparing language acquisition of native English speakers learning Spanish and native Spanish speakers learning English, statistical support for the President's Commission on the Status of Women at SMU, classroom learning outcomes modeling and assessment. *Campus survey manager* – assist members of the SMU community with designing, developing, conducting and analyzing surveys (using both Survey Monkey and Qualtrics); *Advertising* – analyzed factors influencing consumer environmental concerns and green buying patterns; *Anthropology* - study of migratory patterns of ancient civilization in the Upper Karoo, South Africa; *Art History* – analyzed acoustics data of the effect of tapestry on the walls of the Sistine Chapel; *Corporate Communications & Public Affairs* – provided statistical analysis support for a study of voters which assessed their attitudes toward candidates before and after presidential debates; *Biostatistics and Clinical Trials* – degenerative loss of visual function, chemotherapy study, eligibility analysis for hospice intervention, catheter intervention study, analysis of psychiatric instruments, micro-array research, olfactory capacity modeling, physical therapy data analysis and modeling, brainwave responses of patients with communication disorders, cardiac rehabilitation study, effectiveness of cosmetic surgical procedures, cardiovascular risk study of a common type of antibiotic used in hospitals; *Accident and Injury* – review of physician treatment and recommendations for a employee injured at a major wholesale retailer and the employers unfair dismissal of employee; *Business Statistics* – predictive analytics, financial analysis modeling, credit risk modeling, sampling plans for auditing of large databases or inventories, forecasting methodology for real-estate analysis, sampling plans for customer satisfaction surveys, healthcare insurance subscriber trends; *Communications* - study comparing preference for surround sound versus traditional cinema sound technology.

**Statistical Computing**

Strong background in implementing software applications including tool development in both UNIX and Windows environments: SPSS, Statistica, Visual Basic, Excel macros, SAS, Qualtrics survey software, R, graphical programming, the UNIX operating system, ksh/csh/sh, awk/gawk, Javascript and html/xhtml, Access, FORTRAN, RATFOR, S interface language, Splus, Filemaker Pro.

## EXPERIENCE SUMMARY

**Southern Methodist University** *Dallas, TX 1999 - present*

Adjunct Professor, Department of Statistical Science
Statistical Consulting, Office of Assessment & Accreditation
Statistical Consulting and Research Support, Center for Teaching Excellence
Statistical Consulting and Research Support, Academic Technology Services
Director, Center for Statistical Consulting and Research, Department of Statistical Science
Addl: SMU President's Commission on the Status of Women, 2011-2014

**MCI WorldCom Telecommunications** *Dallas, TX 1997 - 1999*

Sr. Engineer II, Network Design Standards, Network Reliability and Performance

**The Applied Research Laboratories, The University of Texas at Austin** *Austin, TX 1991 - 1997*

Research Scientist Associate V, Telecommunications Systems & Network Modeling and Simulation, Radio Frequency Propagation Analysis and Optimization Methods, Radio Frequency Mission Planner
System Test Branch Manager, Fire Support Artillery Test System

**Bell Communications Research** *Red Bank, NJ 1984 - 1989*

District Manager, Operator Systems Analysis
District Manager, Analysis Systems District
Member of Technical Staff, Software Systems and Software Quality Analytical Methods District
Member of Technical Staff, Switching Processor and Field Performance District
Additional:
- Bellcore Software Metrics Steering Committee Member
- Center Technical Organization Contact for Ph.D./M.S. campus hires
- Center representative to the Area Peer Group
- Center alternate representative to Bellcore's Early Career Advisory Program Committee
- Center Management Committee Member - address career development issues
- Division Education and Training Coordinator
- Session Chair, Army Research Office Workshop on System Reliability
- Developed two modules of Bellcore's Reliability Workshop

**Bell Telephone Laboratories** *Naperville, IL 1978 - 1983*

Member of Technical Staff, System Analysis and Human Factors Group
Member of Technical Staff, Network and Processor Utilization Group
Additional: Bell Telephone Laboratories Statistics Day Committee Member (1980 - 1983)

**Southern Methodist University** *Dallas, TX 1973 - 1978*

Department of Statistics
- Research Assistant, Office of Naval Research Grant
- Teaching Assistant
- Teaching Instructor

**Texas Instruments** *Dallas, TX 1976 (summer student intern)*

Ecological Services Group, Statistical Consultant/Analyst

**PUBLICATIONS**

1. Pearson, N. Shirlene. *Greater Western Library Alliance Library Training Study*, January 31, 2017. Unpublished manuscript commissioned by GWLA and provided to all library deans of the universities who are members of GWLA.
2. Melissa Bowles-Terry, Head of Educational Initiatives, UNLV Libraries; Zoltán Szentkirályi, Director of Assessment, SMU CUL; N. Shirlene Pearson, PhD, Pearson Statistical Consulting & Expert Testimony. *The Impact of Library Instruction Programs on Student Success and Retention: A Multi-Institution Study*, scheduled for presentation on February 27, 2017 at a GWLA conference.
3. Dennis R. Hoffman, Ph.D., Dianna K. Hughbanks-Wheaton, M.S., Ph.D., Rand Spencer, M.D., Gary E. Fish, M.D., N. Shirlene Pearson, Ph.D., Yi-Zhong Wang Ph.D., Martin Klein, M.S., Alison Takacs, B.S., Kirsten G. Locke, R.N., and David G. Birch, Ph.D. *Docosahexaenoic Acid Slows Visual Field Progression in X-Linked Retinitis Pigmentosa: Ancillary Outcomes of the DHAX Trial*. Investigative Opthalmology & Visual Science, October 2015, Vol. 56, No. 11.
4. Dianna Wheaton, David Birch, Gary Fish, Rand Spencer, N. Shirlene Pearson, Alison Takacs, and Dennis Hoffman, *Safety Assessment of Docosahexaenoic Acid (DHA) Supplementation in a 4-Year Randomized Clinical Trial in X-linked Retinitis Pigmentosa (XLRP)*. Investigative Opthalmology & Visual Science, June 24, 2014.
5. Dennis R. Hoffman, Ph.D., Dianna K. Hughbanks-Wheaton, Ph.D., N. Shirlene Pearson, Ph.D., Gary E. Fish, M.D., Rand Spencer, M.D., Alison Takacs, B.S., Martin Klein, M.S., Kirsten G. Locke, R.N., and David G. Birch, Ph.D., *A 4-year randomized, placebo-controlled clinical trial of DocosaHexaenoic Acid in X-linked retinitis pigmentosa: The DHAX Trial.* JAMA Ophthalmology, May 7, 2014.
6. Dennis Hoffman, Dianna Hughbanks-Wheaton, Gary Fish, Rand Spencer, Shirlene Pearson, Alison Takacs, Martin Klein, Kirsten Locke, David Birch. *High Dose Docosahexaenoic Acid in X-linked Retinitis Pigmentosa (The DHAX Trial) A 4-Year Randomized, Controlled Clinical Trial*. Annual meeting of The Association for Research in Vision and Ophthamology, May 8, 2014. Presenters: Hoffman, Wheaton, Spencer and Fish.
7. Kotsanis, Constantine A., MD, MD(H), CCN, Marge Woodward, and N. Shirlene Pearson, PhD, *IPTLD Quality of Life Broad Study*, 2012 Tenth Annual International IPT/IPTLD Integrative Cancer Conference. April 27-28, 2012.
8. Pearson, N. Shirlene, *Introduction to Clickers & Test Questions Using Them (assessing classroom learning outcomes in real time)*, Southwest Regional Conference Educause 2010: Uncommon Thinking for the Common Good. February 17, 2010.
9. Pearson, N. Shirlene, *Introduction to Clickers & Test Questions Using Them (assessing classroom learning outcomes in real time)*, Southwest Regional Conference Educause 2010: Uncommon Thinking for the Common Good. February 17, 2010.
10. Numerous confidential reports in support of projects relating to statistical expert testimony, statistical litigation support and other statistical consulting activities.
11. Pearson, N. S. *SONET Network Availability Models*, MCI WorldCom, confidential technical document, 1998.

12. Pearson, N. S. *Dual Ring Availability Analysis*, MCI WorldCom, confidential technical analysis document, 1998.

13. Pearson, N. S. *Availability Analysis Tool Requirements*, MCI WorldCom, confidential technical document, 1998.

14. Pearson, N. S. *OC-48 Line Performance Study*, MCI WorldCom, confidential study, 1997.

15. Pearson, N. S. *Network Reduction*, Applied Research Laboratories, The University of Texas at Austin. Internal document, 1997.

16. Pearson, N. S. *Ellipsoidal Geodesy*, Applied Research Laboratories, The University of Texas at Austin. Unpublished manuscript, 1995.

17. Pearson, N. S. *Dynamic Allocation of Probability Thresholds for Radio Frequency Mission Planner Acquisition Missions*, Applied Research Laboratories, The University of Texas at Austin, White Paper, 1995.

18. Pearson, N. S. and P. Welton, *Survey of Modern Optimization Methods*, Applied Research Laboratories, The University of Texas at Austin, Lab Report, 1994.

19. Chaddha, R. L., A. W. King, and N. S. Pearson, *Providing Buyer Feedback on Digital Switch Field Performance*, IEEE Journal on Selected Areas in Communications, October, 1988.

20. Chaddha, R. L., A. W. King, and N. S. Pearson, *Providing Buyer Feedback on Digital Switch Field Performance*, IEEE International Conference on Communications, June 7-10, 1987. Presenter: N. S. Pearson.

21. Pearson, N. S. and G. G. Brush, *Framework for Software-Quality Life-Cycle Data and Metrics*, Bell Communications Research, Technical Memorandum, TM-TSY-008710, March 13, 1987.

22. Pearson, N. S., Several restricted publications of Reliability Review Forum activities for a major telecommunications supplier and field performance studies of their large switching system. Bell Communications Research, 1984 - 1986.

23. Pearson, N. S., Several Bell Communications Research Technical Analysis Reports of operator services and telecommunications switching systems suppliers, Bell Communications Research, 1986 - 1989.

24. Pearson, N. S., *4 ESS - Preliminary Guidelines for Memory and Disk Engineering for 4E9 Features*, Bell Telephone Laboratories, Memorandum for File, July 22, 1983.

25. Pearson, N. S., *4E9/APS Disk Engineering*, Bell Telephone Laboratories, Private Communiqué, July 15, 1983.

26. Pearson, N. S., *Proposed Expansion of S Graphics*, Bell Telephone Laboratories, Memorandum for File, July 14, 1982.

27. Pearson, N. S. and J. L. Santee, *T/C CPT Analysis System Measurement Requirements*, Bell Telephone Laboratories, Memorandum for File, April 28, 1982.

28. Pearson, N. S., *No. 2BE3 Main Processor Simulator and Study Results*, Bell Telephone Laboratories, Memorandum for File, December 11, 1981.

29. Pearson, N. S., *No. 2BE3-RSS Traffic Measurements Requirements*, Bell Telephone Laboratories, Memorandum for File, 1981.

30. Pearson, N. S., *2BE3 Post-cutover Capacity Determination - Requirements for EADAS/NORGEN*, Bell Telephone Laboratories, Memorandum for File, 1981.

31. Pearson, N. S., *2B-EF-2 and 2BE3 Register Requirements for EADAS/NORGEN*, Bell Telephone Laboratories, Memorandum for File, 1981.

32. Pearson, N. S., *No. 2B-EF-2 Post-cutover Processor Capacity - Worksheets for a Semi-automated Procedure*, Bell Telephone Laboratories, Memorandum for File, 1981.

33. Pearson, N. S., *No. 2B-EF-2 Post-cutover Processor Capacity Determination*, Bell Telephone Laboratories, Memorandum for File, 1981.

34. Pearson, N. S., *No. 2B-EF-1 Post-cutover Processor Capacity Determination*, Bell Telephone Laboratories, Memorandum for File, 1981.

35. Pearson, N. S., *No. 2ESS Percent Call Carrying Capacity*, Bell Telephone Laboratories, Memorandum for File, 1980.

36. Pearson, N. S., *Proposed Revision of Line Scanning Strategy for No. 2B ESS*, Bell Telephone Laboratories, Memorandum for File, August 13, 1980.

37. Pearson, N. S., *Post-cutover Processor Capacity Determination - No. 2B ESS Manual Procedure*, Bell Telephone Laboratories, Memorandum for File, March 28, 1980.

38. Pearson, N. S., *Algorithmic Call Type Definitions for Current Local ESSs and Measurement Specifications*, Bell Telephone Laboratories, Memorandum for File, December 12, 1979.

39. Pearson, N. S., *Generating Telephone Traffic*, Bell Telephone Laboratories, Private Communiqué, June 18, 1979.

# EXHIBIT B-5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND/ODESSA DIVISION**

| | | |
|---|---|---|
| **JOSEPH HOBBS and DRAKE FEENEY, individually and on behalf of all others similarly situated,** | § | |
| ***Plaintiffs,*** | § | |
| | § | |
| **v.** | § | **MO:17-CV-00030-DC** |
| | § | |
| **PETROPLEX PIPE AND CONSTRUCTION, INC.,** | § | |
| ***Defendant*.** | § | |

**<u>ORDER AWARDING PLAINTIFFS' ATTORNEY FEES</u>**

BEFORE THE COURT is Plaintiffs Joseph Hobbs and Drake Feeney's—individually and on behalf of all others similarly situated—Motion for Attorney Fees. (Doc. 120). On April 1, 2019, this Court signed a Final Judgment in Plaintiffs' favor. (Doc. 123). Pursuant to the Final Judgment, Plaintiffs were awarded a combined total of $50,800.00 in unpaid wages and $50,800.00 in liquidated damages. *Id.* Plaintiffs now request an award of $145,964.25 in attorney fees, $3,924.19 in expenses, and $3,993.04 in costs for a total award of $153,881.48. (Docs. 120, 122).

## I. LEGAL STANDARD

A prevailing plaintiff is entitled to a reasonable award of attorney fees and costs under the Federal Labor Standards Act (FLSA). 29 U.S.C. § 216(b). There is a strong presumption that the lodestar figure represents reasonable attorney fees. *Perdue v. Kenny A.*, 559 U.S. 542, 553–54 (2010). The lodestar is calculated by multiplying the number of hours reasonably expended by an appropriate hourly rate in the community for such work. *See Singer v. City of Waco*, 324 F.3d 813, 829 (5th Cir. 2003). The party seeking attorney fees bears the burden of establishing the number of hours expended through the presentation of adequately recorded time records as

evidence. *See Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir. 1993). The Court then uses this as a benchmark and excludes any time that is excessive, duplicative, unnecessary, or inadequately documented. *See id*. The hours remaining are those reasonably expended. *Id*.

After calculating the lodestar, the Court may either: (1) accept the lodestar figure; or (2) decrease or enhance it based on the circumstances of the case, taking into account what are referred to as the *Johnson* factors. *See La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324, 329 (5th Cir. 1995); *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). The *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the legal issues; (3) the skill required to perform the legal service properly; (4) the preclusion of other employment by the attorney as a result of taking the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or other circumstances; (8) the monetary amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) whether the case is undesirable; (11) the nature and duration of the professional relationship with the client; and (12) awards in similar cases. 488 F.2d at 717–19. However, the lodestar is presumed to be reasonable and should only be modified in exceptional cases. *See Watkins*, 7 F.3d at 457.

## II. DISCUSSION

There is no question that Plaintiffs are the prevailing parties entitled to a reasonable award of attorney fees pursuant to 29 U.S.C. § 216(b). Accordingly, the Court first determines the lodestar in this case.

### A. Lodestar

#### 1. *Reasonable Hourly Rate*

First, the Court will determine whether Plaintiffs' counsel's hourly rate is reasonable when compared to the prevailing rates for attorneys of similar skill and experience in the relevant market. *McClain v. Lufkin Indus., Inc.*, 649 F.3d 374, 381 (5th Cir. 2011) (citing *Blum v. Stenson*, 465 U.S. 886, 895 (1984)). This rate is usually established through affidavits of other attorneys practicing in the relevant community. *Tollett v. City of Kemah*, 285 F.3d 357, 368 (5th Cir. 2002). The relevant community refers to "the judicial district in which the litigation occurred," which, in this case, is the Western District of Texas, Midland/Odessa Division. *See Ramirez v. Lewis Energy Grp., L.P.*, 197 F. Supp. 3d 952, 956 (S.D. Tex. 2016). However, "the district court is itself an expert in assessing these matters." *Davis v. Bd. of Sch. Comm'rs of Mobile Cty.*, 526 F.2d 865, 868 (5th Cir. 1976) (citing *Weeks v. S. Bell Tel. & Tel. Co.*, 467 F.2d 95, 98 (5th Cir. 1972) ("The court is itself an expert on the question and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of testimony of witnesses as to value.").

Plaintiffs' counsel billed an hourly rate of $425 for attorney Chris Miltenberger, $350 for attorneys Rebecca Miltenberger and Steve Ashley, and $110 for the work performed by their paralegal. (Doc. 120-1 at 11). The case was handled by The Law Office of Chris R. Miltenberger, PLLC, and attorney Steve Ashley and his firm Kelly, Morgan, Dennis, Corzine & Hansen, PC. *Id.* at 2.

Mr. Miltenberger has been in practice for approximately thirty-seven (37) years, mainly working on labor and employment law for twenty-six (26) years, including FLSA wage and hour violations. *Id.* at 3. Ms. Miltenberger, the second attorney working on the case, has been in practice for approximately thirty-six (36) years. *Id.* at 4. She has practiced in several areas of the law and has spent about eleven (11) years practicing employment law. *Id.* Finally, the third

attorney, Mr. Ashley, has been in practice for thirty-three (33) years, during which time he has handled a variety of civil matters.[1]

Mr. Miltenberger attests that he charges his fee-paying clients at least $500 per hour and that his hourly rate of $425 in this case is reasonable and in line with the hourly fee rate in the Western District of Texas for a lead lawyer with similar experience and expertise. *Id.* at 8. Mr. Miltenberger provided the affidavit of Holly Williams, another attorney who practices in the Western District of Texas, who attests that the rates of Mr. Miltenberger, Ms. Miltenberger, Mr. Ashley, and the paralegal are reasonable for legal professionals of similar experience and specialization. *Id.* at 9, 42. Ms. Williams explicitly stated that she has been practicing for approximately twenty-six (26) years and has been board certified in Labor and Employment Law by the Texas Board of Legal Specialization since the year 2000. *Id.* at 41. Ms. William's hourly rate for billable work is $425 per hour. *Id.*

Moreover, Mr. Miltenberger provided a chart detailing the attorney fees rate rulings in other employment cases within the Western District of Texas, expanding from 2009 through the present. *Id.* at 22. The most relevant case is *Roberts v. Brinkerhoff Inspection, Inc.*, a 2018 Title VII case in which this Court granted an unopposed motion for attorney fees with an hourly rate of $425. *Id.* at 23; *see also Roberts v. Brinkerhoff Inspection, Inc.*, No. 7:16-cv-00342-DC (W.D. Tex. Midland/Odessa June 22, 2018) (Doc. 86).

Defendant maintains that despite Plaintiffs and Ms. William's assertion that $425 per hour is a reasonable hourly rate for attorneys in the Midland/Odessa area, Plaintiffs' Odessa lawyer billed at an hourly rate of $350. (Doc. 124 at 3). Defendant further contends that the *Roberts* case is distinguishable because the motion for attorney fees in *Roberts* was unopposed.

1. His curriculum vitae lists the following as Mr. Ashley's primary focus: family matters, personal injury defense, oil field litigation, commercial vehicle collision, toxic torts, premises liability, workers' compensation, insurance law, general negligence, and general civil litigation. (Doc. 120-1 at 60).

*Id.* Instead, Defendants urge that the proper rate for all of Plaintiffs' attorneys is $295 per hour, which is the amount this Court previously awarded Defendant's counsel under Rule 37. *Id.* at 4. Defendant then states that the hourly rate should not exceed $350, relying on Plaintiffs' Odessa lawyer's hourly rate. *Id.*

The Court first notes that the *Roberts* case is distinguishable because the request and amount of attorney fees requested was not contested. Next, the Court's finding that a $295 per hour rate is reasonable for Mr. Simon, an attorney for Defendant in this case, does not signify, in view of the parties' distinguishable experience, that the Court should make the same determination as to Mr. Miltenberger, Ms. Miltenberger, or Mr. Ashley. Mr. Miltenberger obtained his license to practice law in 1982, Ms. Miltenberger in 1983, and Mr. Ashley in 1986. (Doc. 120-1 at 4, 16). Mr. Simon, on the other hand, was licensed in 2007. (Doc. 61-1 at 2). Further, Mr. Miltenberger has over twenty-six (26) years experience in labor and employment law. (Doc. 120-1 at 3). Mr. Simon has at most twelve (12) years experience in the same field.

Due to the parties' conflict of opinion, the Court turns to the State Bar of Texas Department of Research and Analysis Hourly Rate Report (Hourly Rate Report).[2] This Court and numerous courts in the Western District of Texas oftentimes rely and take judicial notice of the Hourly Rate Report. *See, e.g., Rhodes v. Vandyke*, No. MO:17-CV-00114-DC, 2018 WL 2925133, at *2 (W.D. Tex. June 11, 2018) (reviewing the State Bar of Texas' 2015 Hourly Rate Fact Sheet); *see also I.W. by & through Karen K. v. Hardin-Jefferson Indep. Sch. Dist.*, No. 1:15-CV-332, 2017 WL 5644386, at *18 (E.D. Tex. Jan. 4, 2017) (same); *Alex v. KHG of San Antonio, LLC*, 125 F. Supp. 3d 619, 624 (W.D. Tex. 2015) ("Judges in the San Antonio Division regularly take judicial notice of the Rate Report."). The Hourly Rate Report details

2. STATE BAR OF TEXAS, 2015 HOURLY FACT SHEET (2015), https://www.texasbar.com/AM/Template.cfm?Section=Demographic_and_Economic_Trends&Template=/CM/Cont entDisplay.cfm &ContentID=34182.

attorney hourly rates by years in practice, location, and type of practice. The most current Hourly Rate Report was published in 2016 and provides information on hourly rates charged in 2015 by Texas attorneys.[3]

Based on the latest report available, the Court finds that in 2015 the median hourly rate for attorneys of experience similar to that of Mr. Miltenberger, Ms. Miltenberger, and Mr. Ashley (over 25 years) was $300, the median hourly rate for attorneys practicing labor and employment law was $278, the median hourly rate for attorneys practicing in West Texas was $225, the median hourly rate for attorneys practicing labor and employment law in West Texas was $225, and, finally, the median hourly rate for attorneys practicing in West Texas with over 25 years of experience was $275. These rates are significantly lower than what was proposed by Plaintiffs and slightly lower than what was proposed by Defendant.

Although the Hourly Rate Report is relevant, the Court finds that Mr. Miltenberger is entitled to a higher rate due to his extensive experience in labor and employment law, primarily representing employees since 2012. Consequently, the Court finds that a reasonable rate for Mr. Miltenberger is $375 per hour. This figure represents an increase over the Hourly Rate Report due not only to Mr. Miltenberger's experience but also the age of the Hourly Rate Report and Mr. Miltenberger's status as lead attorney. For the same reasons, the Court finds that an hourly rate of $325 is reasonable for Ms. Miltenberger and Mr. Ashley.

Additionally, the State Bar of Texas provides a 2014 Hourly Rate table for paralegals.[4] According to the survey, the median hourly rate for a paralegal in West Texas was $95 in 2010

---

3. Plaintiffs filed an expert report from N. Shirlene Pearson, Ph.D., asking the Court to disregard the 2015 Hourly Fact Sheet on the basis that it is not reliable. Based on well-settled precedent in the Western District of Texas, the Court opines that the 2015 Hourly Fact Sheet is a proper basis for determining reasonable attorney fees.

4. STATE BAR OF TEXAS, 2014 PARALEGAL DIVISION COMPENSATION SURVEY 15 tbl. 17, https://www.texasbar.com/AM/Template.cfm?Section=Demographic_and_Economic_Trends&Template=/CM/ContentDisplay.cfm&ContentID=27563.

and raised to $104 in 2014. Considering the age of the Report, the Court opines $110 is a reasonable rate for a paralegal in West Texas.

**2. *Time Reasonably Expended***

The next step in the lodestar analysis is to determine the number of hours reasonably expended on the litigation. As part of the reasonableness inquiry, the fee applicant has the burden of demonstrating the exercise of billing judgment. *Saizan*, 448 F.3d at 799. Billing judgment refers to the exclusion of hours that are excessive, redundant, or unproductive. *Id*. The remedy for lack of billing judgment is a reduction in hours "by a percentage intended to substitute for the exercise of billing judgment." *Id*.

Plaintiffs ask for a minimum 159.35 hours for Mr. Miltenberger's time, 207.15 hours for Ms. Miltenberger's time, 8.60 hours for Mr. Ashley's time, and 24.80 hours for the paralegal's time. (Doc. 120-1 at 11). Those hours amount to 399.9 total hours.

Defendant disputes the number of hours billed in this case, alleging that the Plaintiffs seek compensation for extraneous and unnecessary work. Specifically, Defendant argues that Plaintiffs should not be compensated for the hours they expended to potentially prosecute a collective action and their work related to former Plaintiff Bouman. (Doc. 124 at 4–8). Defendant also alleges that the hours exhausted on closing argument and the Motion for Fees are excessive and objects to all hours reported by Mr. Ashley. Finally, Defendant contends that the Court should reduce the attorney fees by one-third because Plaintiff Humphrey was not a prevailing party and Plaintiffs' counsel expended an equal amount of time litigating Plaintiff Humphrey's claim which this Court found was outside the statute of limitations.

i. *Attorney Fees for Work Related to the Collective Action*

As noted previously, the party requesting fees bears the burden of establishing that they are entitled to an award and that they employed billing judgment by recording the reasonable hours consumed in the case and hourly rates and by writing off unproductive, excessive, or redundant hours. *See Kellstrom*, 50 F.3d at 324 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983); *Bode v. United States*, 919 F.2d 1044, 1047 (5th Cir. 1990)); *see also Watkins*, 7 F.3d at 457 ("[T]he court should exclude all time that is excessive, duplicative, or inadequately documented."). Normally, a party "who is unsuccessful at a stage of litigation that was a necessary step to her [or his] ultimate victory is entitled to attorney's fees even for the unsuccessful stage." *Alex v. KHG of San Antonio, LLC*, 125 F. Supp. 3d 619, 626 (W.D. Tex. 2015) (quoting *Air Transp. Ass'n of Canada v. FAA*, 156 F.3d 1329, 1335 (D.C. Cir. 1998)). This is because the unsuccessful stage was necessary to ultimately prevailing on his or her claims and because it is rare when a prevailing party does not lose some battles before "winning the war." *Id.* ("Rare, indeed, is the litigant who doesn't lose some skirmishes on the way to winning the war." (quoting *Air Transp. Ass'n Canada*, 156 F.3d at 1335). Several courts in the Western District of Texas refuse to deny time spent on motions that are "tied to advancing the course of litigation solely on the basis that the [p]laintiffs did not prevail on them." *Rodriguez v. Mech. Tech. Servs., Inc.*, No. 1:12-CV-710-DAE, 2015 WL 8362931, at *4 (W.D. Tex. Dec. 8, 2015) (citations omitted).

Defendant seeks to exclude time spent on conditionally certifying the class. (Doc. 124 at 5–6). This encompasses Plaintiffs' counsel's time spent on formulating the motion for certification and notice, including research associated with certification, the preparation of four declarations that were attached to the motion, drafting a reply brief, creating a list for notice to

potential plaintiffs, preparing notice documents, mailing notice, and preparing a list of opt-in plaintiffs with information regarding work dates. *Id.* Defendant reasons that because the only two prevailing Plaintiffs were already named Plaintiffs and not opt-ins, the conditional certification did not render a prevailing party or a prevailing claim and thus Plaintiffs should not recover for fees associated with their efforts to certify the class. *Id.* Plaintiffs generally assert that the motion to certify the collective action was successful and that it was tied to advancing the course of litigation, citing *Rodriguez v. Mechanical Technical Services* for support. (Doc. 127 at 5). For the reasons detailed below, the Court agrees with Defendant that time employed on certifying the collective action should be excluded.

First, the Court notes that although Plaintiffs cite to *Rodriguez* for the proposition that a prevailing party may recover attorney fees for time spent on motions on which they were not successful when such time is "tied to advancing the course of litigation," at no point do Plaintiffs explain how certifying the class was actually tied to advancing the course of this litigation. (Doc. 127 at 5–6). Courts that refused to deny compensation for work expended pursuing a collective action when the motion to certify was unsuccessful did so on the basis that the work was related and relevant to the plaintiffs' success. *See, e.g.*, *Alex*, 125 F. Supp. 3d at 626 (awarding attorney fees for time expended on pursuing a collective action even though the plaintiffs did not move for collective action certification because the identity of the other potential plaintiffs was relevant to plaintiff's claim); *Johnson v. Big Lots Stores, Inc.*, 639 F. Supp. 2d 696, 702 (E.D. La. 2009) (refusing to deny fees even though the effort to certify the class was unsuccessful where the work performed during the collective action phase was essential to subsequent litigation); *see also Rodriguez*, 2015 WL 8362931, at *4 ("The Court will not deny time spent on motions that *were tied to advancing the course of litigation* solely on the

basis that the Plaintiffs did not prevail on them." (emphasis added) (citations omitted)). Plaintiffs fail to explain how the time exhausted on conditionally certifying the case at bar was relevant to the individual prevailing Plaintiffs' claims nor how it contributed to Plaintiffs' victory. Additionally, the Court finds persuasive that Defendant does not seek to exclude hours related to discovery during the conditional certification phase or other work that benefited the prevailing Plaintiffs.

Next, the Court recognizes that it granted the motion to conditionally certify the case as a collective action. Thus, in that context, Plaintiffs prevailed on the motion. Nonetheless, the Court reiterates that Plaintiffs have not shown that the success of Plaintiffs' claims was dependent on certification nor that Plaintiffs obtained a benefit from the opt-in plaintiffs. The Court opines that—considering that the degree of success obtained is the "most critical factor" in determining a fee award[5]—a reasonable fee award in relation to the results achieved requires the deduction of hours Plaintiffs' attorneys expended certifying the collective action. *See, e.g.*, *Clarke v. Ford Motor Co.*, No. 01-C-0961, 2006 WL 752902, at *8 (E.D. Wis. Mar. 21, 2006) ("I agree that plaintiff's lack of success on the class claims justifies a reduction in the award."); *Grochowski v. Ajet Const. Corp.*, No. 97 CIV. 6269 (NRB), 2002 WL 465272, at *5 (S.D.N.Y. Mar. 27, 2002) (reducing fees award, in part, "based on lack of success for half the original plaintiffs"); *see also Kalloo v. Unlimited Mech. Co. of NY*, 977 F. Supp. 2d 209, 213 (E.D.N.Y. 2013) (approving the omission of fees for the collective part of the action where "plaintiffs succeeded on their motion to certify a collective action… but… only the three named plaintiffs went forward").

According to Plaintiffs' records and Defendant's allegations, Plaintiffs' attorneys spent and are billing for the following hours in relation to collective action certification: Mr.

---

5. *See Volk v. Gonzalez*, 262 F.3d 528, 534 (5th Cir. 2001) (reiterating that the degree of success is "the most critical factor in determining the reasonableness of a fee award" (quoting *Farrar v. Hobby*, 506 U.S. 103, 121 (1992))).

Case 7:17-cv-00030-DC Document 130 Filed 05/23/19 Page 11 of 21

Miltenberger 2; Ms. Miltenberger 21.2 (accounting for the two-hour time adjustment applied by Plaintiffs in exercising billing judgment); paralegal 3.3. Accordingly, the Court excludes those hours from the total reasonable hours spent on the case.

ii. *Fees Related to Former Plaintiff Bouman*

Defendant and Plaintiffs agree that Plaintiffs should not recover fees for efforts related to Bouman. (Docs. 124 at 6; 127 at 6 n.2). Accordingly, the Court deducts .75 hours expended by Mr. Miltenberger on behalf of Bouman.

iii. *Fees Related to Closing Argument & Motion for Fees*

Defendant contends that Plaintiffs' counsel employed an excessive amount of time preparing the written closing argument and the instant Motion for Attorney Fees. (Doc. 124 at 6–8). Namely, Defendant argues that spending 41.3 hours on the written closing argument, which is more than the amount of time Plaintiffs' counsel seeks in fees for preparation of trial testimony, trial notebooks, exhibits, opening statement, and Plaintiffs' counsel's participation in the one-day trial, is unreasonable. *Id.* at 7. Plaintiffs counter that the hours expended on closing argument and the instant Motion were necessary. (Doc. 127 at 6).

After a thorough assessment, the Court finds that Plaintiffs have failed to demonstrate the reasonableness of the 41.3 hours claimed for completing and filing their Post-Trial Brief. Plaintiff's Post-Trial Brief is composed of three main sections: (1) Plaintiffs' analysis of the evidence as it relates to their employee status and the relevant law and Plaintiffs' analysis as to the per diem issue; (2) Findings of Facts; and (3) Conclusions of Law. (*See generally* Doc. 115). Two of those sections are relatively similar to Plaintiffs' Proposed Findings of Fact and Conclusions of Law; a document Plaintiffs filed before trial and for which they also billed. (*Compare* Doc. 105, *with* Doc. 115; *see also* Doc. 120-1 at 10). In fact, the Conclusions of Law

section in the Post-Trial Brief had minimal edits. (*Compare* Doc. 105 at 18–46, *with* Doc. 115 at 45–71). Although Plaintiffs indicate that Plaintiffs' counsel spent most of their time supplementing the Post-Trial Brief's Findings of Fact section by citing the transcript of the trial (Docs. 120-1 at 11; 127 at 6), the Court believes the hours spent on this task are excessive. Plaintiffs' Findings of Fact section expands over twenty pages of the seventy-two-page Brief. Plaintiffs' counsel spent more time reading and citing the transcript of a one-day trial than they did developing their twenty-four-page argument. (*See* Doc. 120-1 at 11 (indicating 4 hours were spent on preparing the "argument section of post-trial brief")).

Consequently, the Court reduces the number hours consumed on preparing the Post-Trial Brief to thirty (30) hours, bearing in mind that Plaintiffs' counsel had already deducted four (4) hours for billing purposes. *See, e.g.*, *Rouse v. Target Corp.*, 181 F. Supp. 3d 379, 389 (S.D. Tex. 2016) ("The Court finds that, in light of the limited procedural history of this case and the billing summary submitted, the amount of attorney hours claimed—111.5—is excessive."); *Hayes v. Astrue*, No. 3:09-CV-2018-G BK, 2010 WL 5479611, at *2 (N.D. Tex. Dec. 3, 2010), *report and recommendation adopted*, No. 3:09-CV-2018-G BK, 2011 WL 9049 (N.D. Tex. Jan. 3, 2011) (reducing hours spent on a motion because "Plaintiff has failed to demonstrate the reasonableness" of those hours). Because Ms. Miltenberger worked on the Post-Trial Brief the majority of the time, the Court will exclude the 11.3 hours from Ms. Miltenberger's total hours.

As to the hours expended on the Motion for Attorney Fees, the Court finds only one entry duplicative. Otherwise, the hours are reasonable. *See, e.g.*, *Prater v. Commerce Equities Mgmt. Co., Inc.*, No. CIV.A. H-07-2349, 2008 WL 5140045, at *7 (S.D. Tex. Dec. 8, 2008) (finding 46.8 spent on a fee application excessive given the attorney's experience with FLSA cases but only reducing it to 30 hours). Specifically, the billing statement indicates that Mr. Ashley spent

.4 hours receiving and reviewing the Court's ruling and that Ms. Miltenberger spent part of .6 hours also reviewing the Court's Order.[6] (Doc. 120-1 at 12). Accordingly, the Court reduces the hours spent on the Motion for Attorney Fees by .4, the duplicative hours employed by Mr. Ashley to review the Court's ruling. *See, e.g.*, *Rouse*, 181 F. Supp. 3d at 389 (deducting hours for duplicative work when the billing records reflected that multiple attorneys had duplicated several tasks).

iv. *Fees for Mr. Ashley's Work*

In a footnote, Defendant contends that Plaintiffs should not recover for any hours expended by Mr. Ashley on the basis that Mr. Ashley's time occurred before a lawsuit was ever filed or consisted of "receiving and reviewing" work produced by Mr. Miltenberger and his firm. (Doc. 124 at 3 n.1). Upon reviewing Plaintiffs' billing statement, the Court finds Mr. Ashely spent time on tasks that were duplicative and unnecessary.

Mr. Ashley spent 4.7 hours speaking with Plaintiff Hobbs and Mr. Miltenberger regarding Plaintiff Hobbs's FLSA claim, investigating the factual circumstances surrounding the FLSA claim, and case logistics. (Doc. 120-1 at 44). The Court considers Mr. Ashley's investigative work necessary prior to filing suit. Moreover, Defendant does not point to caselaw indicating otherwise. (Doc. 124 at 3).

After Mr. Miltenberger prepared and filed Plaintiffs' Complaint, Mr. Ashley received and reviewed a copy of the Complaint. The Court finds that it was unnecessary for more than one attorney to review the Complaint, even if the attorneys, both representing the same party, work for different firms. Accordingly, the Court will reduce the 1.6 hours Mr. Ashley spent on

---

6. The billing statement indicates that Ms. Miltenberger utilized .6 hours to read the Court's Findings of Fact and Conclusions of Law, initiate the Motion for Attorney Fees, and to conduct research on fees in the Western District of Texas. (Doc. 120-1 at 55).

receiving and reviewing the Complaint, along with other tasks, to 1.2 hours. (Doc. 120-1 at 45). Such reduction reflects the time Mr. Ashley spent reviewing the Complaint. (Doc. 120-1 at 45).

For similar reasons, the Court also deducts one (1) hour from Mr. Ashley's total hours. This deduction is for time Mr. Ashley spent receiving, reviewing and approving the contingency fee agreement prepared by Mr. Miltenberger, the lead attorney in the case, receiving and reviewing Plaintiffs' deposition notices, and receiving and reviewing the Court's Order denying summary judgment. The Court finds it redundant for Mr. Ashley to review the agreement and excessive for Plaintiffs to bill for such work given that Mr. Miltenberger, the lead attorney, had prepared the document and that Plaintiffs do not explain the reasonableness of the entry. Likewise, it was unnecessary for Mr. Ashley to review the deposition notices when Mr. Miltenberger, not Mr. Ashley, prepared the materials for Plaintiffs' depositions, met with Plaintiffs to prepare them for the depositions, and participated in the depositions. (Doc. 120-1 at 49). Finally, Plaintiffs failed to explain the reasonableness of the time Mr. Ashley spent on reviewing the Court's Order denying summary judgment. Given Mr. Ashley's rather minimal involvement in conducting research and drafting motions, responses, and other documents, the Court finds Mr. Ashley's time spent on reading the Court's Order unreasonable and unnecessary.

As to the remaining hours expended by Mr. Ashley, the Court finds them reasonable. Thus, the Court deducts a total of 1.4 hours from Mr. Ashley's total hours spent on this case on the basis that said hours were duplicative and unnecessary.

* * *

After subtracting the unreasonable hours and considering the time adjustment made by Plaintiffs, the compensable hours are:

1. **Mr. Miltenberger: 156.6** (159.35 hours requested minus 2 hours for unreasonable time spent on collective action certification minus .75 hours spent on behalf of Mr. Bouman);

2. **Ms. Miltenberger: 174.65** (207.15 hours requested minus 21.2 hours for unreasonable time spent on collective action certification minus 11.3 hours for excessive time spent on the Post-Trial Brief);

3. **Mr. Ashley: 6.8** (8.6 hours requested minus 1.8 hours spent conducting duplicative and unnecessary work);

4. **Paralegal: 21.5** (24.8 hours requested minus 3.3 hours for unreasonable time spent on collective action certification).

### 3. *Lodestar Total*

For the above reasons, the Court finds the appropriate lodestar is as follows:

| | **Hours Requested** | **Hours Deducted** | **Total Reasonable Hours** | **Reasonable Hourly Rate** | **Lodestar Total (Hours x Rate)** |
|---|---|---|---|---|---|
| Mr. Miltenberger | 159.35 | 2.75 | 156.6 | $375.00 | $58,725.00 |
| Ms. Miltenberger | 207.15 | 32.5 | 174.65 | $325.00 | $56,761.25 |
| Mr. Ashley | 8.6 | 1.8 | 6.8 | $325.00 | $2,210.00 |
| Paralegal | 24.8 | 3.3 | 21.5 | $110.00 | $2,365.00 |
| **Total:** | | | | | **$120,061.00** |

## B. *Johnson* Factors

Next, the Court turns to the *Johnson* factors to decide whether a departure from the lodestar figure is warranted in this case. *Kellstrom*, 50 F.3d at 324, 329. In setting the lodestar, the Court considered some of the *Johnson* factors, such as the time and labor required in this FLSA action, the experience and ability of Plaintiffs' counsel, the customary fee in West Texas, and the award in similar cases. Plaintiffs do not request an upward adjustment based on the *Johnson* factors. Defendant, on the other hand, urges the Court to reduce attorney fees by one-third to account for the work Plaintiffs' counsel accomplished for Plaintiff Benjamin Humphrey,

a non-prevailing party. (Doc. 124 at 2–3). Defendant argues that because Plaintiffs' claims "were inextricably intertwined in that they all had the same claims against Defendant… all discovery, motion practice, and trial efforts were expended equally on behalf of all three Plaintiffs." *Id.* Thus, Plaintiffs' fee award should be reduced by one-third for all time on or after February 20, 2017, when Plaintiff Humphrey entered the case.

Plaintiffs counter that where the legal services are inextricably intertwined, "Texas law recognizes that there is no duty to segregate fees." (Doc. 127 at 2). Further, the argue that because the discovery, motion practice, and trial efforts expended on behalf of all Plaintiffs, including Humphrey, were crucial to Plaintiffs' claims, such services would have been nonetheless incurred on behalf of the prevailing Plaintiffs. *Id.* at 3.

The Court notes that Plaintiffs' reliance on *Navigant Consulting, Inc. v. Wilkinson* is misplaced. 508 F.3d 277, 298 (5th Cir. 2007). In that case, the Fifth Circuit turned to Texas law because the plaintiff's fee award was justified under the Texas Civil Practice & Remedies Code. *Id.* In the instant case, Plaintiffs are entitled to attorney fees under the FLSA. Nonetheless, the Court agrees with Plaintiffs that the lodestar should not be reduced by one-third as urged by Defendant.

Plaintiffs' counsel may not recover fees for non-prevailing plaintiffs, such as Plaintiff Humphrey. *See Gurule v. Land Guardian, Inc.*, No. 4:15-CV-03487, 2017 WL 6761821, at *3 (S.D. Tex. Oct. 24, 2017), *aff'd*, 912 F.3d 252 (5th Cir. 2018) (citing *Ramirez v. Lewis Energy Grp., L.P.*, 197 F. Supp. 3d 952, 958 (S.D. Tex. 2016)). However, there is no precise rule or formula in deciding how to calculate attorney fees where some claims failed. *Id.* (citing *Hensley*, 461 U.S. at 436–37). In *Gurule*, the district court made a 29.1 percent reduction in the lodestar in order to account for the time plaintiffs' counsel spent representing two non-prevailing plaintiffs.

*Id.* Relevantly, the billing entries, in that case, referred only to the non-prevailing plaintiffs. *Id.* After reviewing the billing entries made by Plaintiffs' counsel, the Court finds that, unlike *Gurule*, the entries in Plaintiffs' counsel's billing statement were made on behalf of all three Plaintiffs, except for the deposition of Plaintiff Humphrey. (*See generally* Doc. 120-1). However, Plaintiff Humphrey's deposition statements were relevant and utilized by Plaintiffs in making their summary judgment arguments.

Finally, the Court notes that it has already reduced the fees awarded Plaintiffs due to their limited success. *Gurule*, 2017 WL 6761821, at *3 ("The district court may attempt to identify specific hours that should be eliminated, *or* it may simply reduce the award to account for the limited success." (emphasis added)); *see also Ramirez*, 197 F. Supp. 3d at 958 (eliminating hours spent drafting documents on behalf of plaintiffs that were dismissed). Namely, the Court identified specific hours spent on conditional certification because it did not result in a single prevailing plaintiff.

Accordingly, the Court will not depart from the lodestar amount.

**C. Costs**

Finally, Defendant argues that Plaintiffs should not recover costs for postage, airfare, Uber fees, meals, hotels, parking, mileage, car rental fees, and mediation. (Doc. 124 at 8). Instead, Defendant suggests Plaintiffs recover only for what is outlined in the Bill of Costs. *Id.*

District courts may award only those costs enumerated in 28 U.S.C. § 1920 "absent explicit statutory or contractual authorization to the contrary." *Mota v. Univ. of Texas Houston Health Sci. Ctr.*, 261 F.3d 512, 529 (5th Cir. 2001). Section 1920 lists the following costs: "(1) Fees of the clerk and marshal; (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case; (3) Fees and disbursements for printing and

witnesses; (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case; (5) Docket fees under section 1923 of this title; (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title." 28 U.S.C. § 1920(1)–(6). The Fifth Circuit has also awarded travel expenses in Title VII and ADEA cases, reasoning that such expenses are allowed as part of attorney fees pursuant to Title VII[7] and the ADEA.[8] *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 396 (5th Cir. 2003) (acknowledging travel expenses are recoverable under Title VII and following sister circuits in allowing the recovery of out-of-pocket travel expenses as part of an attorney fee award under the ADEA). Accordingly, even if out-of-pocket expenses are not recoverable under § 1920, the Court may turn to "explicit statutory… authorization to the contrary" to award costs, such as statutory authorization under the FLSA. *Mota*, 261 F.3d at 529.

Under the FLSA, district courts "shall… allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b). The Court opines that this includes "reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services." *Mota*, 261 F.3d at 529 (citations omitted); (*see also* Doc. 120-1 at 12). For this conclusion, the Court relies on the Fifth Circuit's finding that out-of-pocket expenses for travel are recoverable under the ADEA, agreeing with the Eighth Circuit and the Seventh Circuit. *West*, 330 F.3d at 396. The Court's reliance is premised

---

7. Title VII allows the recovery of "a reasonable attorney's fee as part of the costs." 42 U.S.C. § 2000e–5(k). The Fifth Circuit has allowed the recovery of out-of-pocket expenses in Title VII cases, "such as postage, photocopying, paralegal services, long distance telephone charges, and travel costs." *Mota*, 261 F.3d at 529 ("This Court has interpreted the 'attorney's fee' allowed by Section 2000e–5(k) to include 'reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services….'" (citations omitted)).

8. The Fifth Circuit found that the ADEA, through reference to the FLSA's remedial provision, provides for reasonable attorney fees and thus it saw no reason why the district court should be precluded from awarding out-of-pocket expenses for travel under the ADEA. *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 396 (5th Cir. 2003).

on the fact that the ADEA and the FLSA share a remedial scheme evinced by the ADEA's incorporation of the FLSA's enforcement and remedial provisions. 29 U.S.C. § 626(b) ("The provisions of this chapter shall be enforced in accordance with the powers, remedies, and procedures provided in sections 211(b), 216 (except for subsection (a) thereof), and 217 of this title, and subsection (c) of this section."); *see also Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 74 (2000) (acknowledging the incorporation of the FLSA's enforcement provisions into the ADEA and explaining that the remedial options operate with the ADEA's enforcement provision).

In sum, travel expenses and postage are recoverable in this FLSA case as they represent reasonable out-of-pocket expenses incurred by Plaintiffs' counsel which are normally charged to fee-paying clients in the course of providing legal services. Further, the Court finds that the proposed out-of-pocket expenses are reasonable. *See, e.g.*, *Mata v. Caring for You Home Health, Inc.*, No. 7:13-CV-287, 2015 WL 12780641, at *3 (S.D. Tex. May 12, 2015) (allowing the recovery of "reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client"); *see also Sales v. Bailey*, No. 2:12-CV-00056-SA-SAA, 2015 WL 1825060, at *6 (N.D. Miss. Apr. 22, 2015) (awarding reasonable out-of-pocket expenses under the FLSA). Mr. Miltenberger specifically asserts that the costs and expenses were "reasonably, necessarily and actually incurred in [the] litigation" and that they "are of the type that [counsel] normally charge[s] to fee-paying clients." (Doc. 120-1 at 12). As to the mediation fee, the Court declines to award costs relating to mediation. *Cook Children's Med. Ctr. v. New England PPO Plan of Gen. Consol. Mgmt. Inc.*, 491 F.3d 266, 275 (5th Cir. 2007) (declining to award mediation fees under § 1920 and under ERISA); *see also Mota*, 261 F.3d at 530

(acknowledging that under Title VII "reasonable attorney's fees" include out-of-pocket expenses but finding mediation expenses are not "reasonable out-of-pocket expenses").

The Court recognizes that various district courts have refused to allow the recovery of costs not listed in § 1920. *See Martinez v. Refinery Terminal Fire Co.*, No. 2:11-CV-00295, 2016 WL 4594945, at *14 (S.D. Tex. Sept. 2, 2016) ("Other courts in this circuit when faced with disputed requests for costs, including expenses that normally are passed on to a client by an attorney, routinely deny requests for items that are not listed in § 1920." (citing a list of cases)). Nonetheless, this Court sides with district courts that have allowed the recovery of expenses relying on statutory authorization under Title VII, the ADEA, and the FLSA.

The Court will allow Plaintiffs to recover for the items identified in their Bill of Costs, totaling $3,993.04. (Doc. 122). Additionally, having reviewed the expenses for postage and travel, the Court opines that they are reasonable and necessary for use in the case. (Doc. 120-1 at 57–58). Accordingly, Plaintiffs may recover **$3,993.04** in costs and **$2,974.19** in expenses ($3,924.19 total expenses requested minus $950.00 expended on mediation). *Id.*

## III. CONCLUSION

Based on the foregoing discussion, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' Motion for Attorney Fees. (Doc. 120).

The Court **ORDERS** that Plaintiffs are hereby awarded **$120,061.00** in attorney fees, **$3,993.04** in costs, and **$2,974.19** in expenses.

It is so **ORDERED**.

SIGNED this 23rd day of May, 2019.

DAVID COUNTS

UNITED STATES DISTRICT JUDGE

# EXHIBIT B-6

CHRIS MILTENBERGER
LAW OFFICE

# STATEMENT

STATEMENT NUMBER: 346
STATEMENT DATE: JUNE 26, 2020

DUE DATE: JUNE 26, 2020
PAYMENT TERMS: DUE ON RECEIPT

FROM: The Law Office of Chris R. Miltenberger, PLLC
1360 N. White Chapel
Suite 200
Southlake, TX 76092

TO: Toni Chaves

| DATE | ATTORNEY | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|---|
| JUL-17-19 | CRM | Preparation of Complaint and initial documents for filing lawsuit. | 3.00 | $375.00 | $1,125.00 |
| JUL-18-19 | Expense | Filing fee for Complaint. | 1.00 | $400.00 | $400.00 |
| AUG-15-19 | Expense | Service of Summons through private process server (fee reduced to $65.00). | 1.00 | $95.00 | $95.00 |
| AUG-22-19 | CRM | Review of Answer filed by Defendant. | 0.25 | $375.00 | $93.75 |
| OCT-10-19 | CRM | Preparation of third party discovery for phone records. | 0.75 | $375.00 | $281.25 |
| OCT-11-19 | CRM | Preparation for and participation in Rule 26 scheduling conference with defendant's counsel. | 0.50 | $375.00 | $187.50 |
| OCT-25-19 | CRM | Preparation for and participation in Initial Scheduling Conference hearing with Court. | 0.40 | $375.00 | $150.00 |
| OCT-28-19 | CRM | Preparation of written discovery to defendant. | 1.00 | $375.00 | $375.00 |
| DEC-16-19 | RKM | Draft Court ordered Initial Designations (.8); | 0.80 | $325.00 | $260.00 |
| DEC-19-19 | CRM | Review of discovery responses and documents produced by Defendant. | 1.50 | $375.00 | $562.50 |
| JAN-22-20 | CRM | Preparation of motion to file amended complaint. Preparation of amended complaint. | 1.10 | $375.00 | $412.50 |
| FEB-26-20 | RKM | Draft Motion to Abate Deadlines and accompanying Proposed Order (.7); | 0.70 | $325.00 | $227.50 |
| APR-20-20 | RKM | Research requirements for damages in Motion for Default Judgment (.8); | 0.80 | $325.00 | $260.00 |

STATEMENT NUMBER: 346

| DATE | ATTORNEY | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|---|
| APR-22-20 | RKM | Continue research requirements for damages in Motion for Default Judgment (.4); | 0.40 | $325.00 | $130.00 |
| JUN-05-20 | RKM | Review file and research law for Motion for Default Judgment in Western Division ((1.8); Write client with factual questions for declaration (.3); | 2.10 | $325.00 | $682.50 |
| JUN-22-20 | RKM | Review information from client (.2); research various elements for Motion for Default Judgment (1.8) and begin draft of MDJ (2.1); | 4.10 | $325.00 | $1,332.50 |
| JUN-23-20 | RKM | Review documents in case (1.9); begin draft of plaintiff's declaration (2.0); continue research of various elements for Motion for Default Judgment (1.3); and start draft of MDJ (1.1); | 6.30 | $325.00 | $2,047.50 |
| JUN-24-20 | RKM | Continue to draft and revise plaintiff's declaration with correspondence to and from plaintiff (1.6); continue research of various elements for Motion for Default Judgment (2.0); and continue draft of MDJ (5.0); | 8.60 | $325.00 | $2,795.00 |
| JUN-25-20 | RKM | Continue to draft and revise and finalize plaintiff's declaration with correspondence to and from plaintiff (1.6); continue research regarding claims for various damages for Default Judgment (2.0); and continue draft of MDJ (3.1); | 6.70 | $325.00 | $2,177.50 |
| JUN-26-20 | CRM | Preparation of declaration of Chris Miltenberger in support of attorneys' fees. | 0.50 | $375.00 | $187.50 |
| JUN-26-20 | RKM | Finalize MDJ, Exhibits thereto and prepare for filing (7.8) | 7.80 | $325.00 | $2,535.00 |
| | | Total amount of this statement | | | $16,317.50 |

| MESSAGE |
|---|
| I appreciate the opportunity to help you! |

# EXHIBIT B-7

# Expense List

Print | Close Window

| Date | Client Name | Project | Type | Description | Quantity | Unit Amount | Amount |
|---|---|---|---|---|---|---|---|
| 7/18/2019 | Toni Chaves | Expense | Filing Fee | Filing fee for Complaint. | 1.00 | 400.000 | $400.00 |
| 8/15/2019 | Toni Chaves | Expense | Service of Citation Fee | Service of Summons through private process server (fee reduced to $65.00). | 1.00 | 95.000 | $95.00 * |
| **TOTALS** | | | | | **2.00** | | **$495.00** |

Reduced to $65.00 for total of $465.00

# EXHIBIT B-8

# RESPONSE COVER SHEET

AT&T
11760 US HWY 1, SUITE 300
NORTH PALM BEACH FL 33408

Phone (800) 635-6840 Facsimile (888) 938-4715

**To:** **CHRIS MILTENBERGER, ESQ**
**LAW OFFICES OF CHRIS MILTENBERGER, PLLC**
**1340 N. WHITE CHAPEL BLVD, STE 100**
**SOUTHLAKE, TX 76092**

**File Code: 2834166**

**From: SEP**

**Phone Number: (817) 416-5060**
**Fax Number: 1(817) 416-5062**
**Case Number: 5:19-CV-861**
**Case Name: CHAVES VS COGENT MEDICAL LAB, LLC 5:19-CV-861**

**Request Dated: 10/15/2019**
**Received On: 10/15/2019**

**Number of Pages:**
**Date: 11/6/2019**

**After conducting a thorough search of all identifiers listed in the legal demand, all available information responsive to this demand is enclosed.**

**CONFIDENTIALITY NOTICE**

This cover sheet, and any document which may accompany it, contains information from the Global Legal Demand Center which is intended for use only by the individual to whom it is addressed, and which may contain information that is privileged, confidential and/or otherwise exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the person responsible for delivering this message to the intended recipient, any review, disclosure, dissemination, distribution, copying or other use of this message or its substance is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone to arrange for the return of this communication to us at our expense. Thank you.

AT&T
11760 US HWY 1, SUITE 300
NORTH PALM BEACH FL 33408

(800) 635-6840
(888) 938-4715 (Fax)

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, **Sebastian Parra**, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by **AT&T**, and my title is **Legal Compliance Analyst**. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of **AT&T**. I further state that:

a. All records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of **AT&T** , and they were made by **AT&T** as a regular practice; and

b. Such records were generated by **AT&T's** electronic process or system that produces an accurate result, to wit:

1. The records were copied from electronic device(s), storage medium(s), or file(s) in the custody of **AT&T** in a manner to ensure that they are true duplicates of the original records; and

2. The process or system is regularly verified by **AT&T**, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

November 6, 2019 — *Sebastian Parra*

Date — Signature

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of Texas

| | | |
|---|---|---|
| Toni Chaves<br>*Plaintiff*<br>v.<br>Cogent Medical Laboratory, LLC<br>*Defendant* | ) ) ) ) ) ) | Civil Action No. 5:19-cv-861 |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Cricket Communications, Inc dba Cricket Wireless

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See documents described on Rider attached as Exhibit A

| Place: Law Office of Chris R. Miltenberger, PLLC<br>1360 N. White Chapel, Suite 200<br>Southlake, Texas 76092 | Date and Time:<br>11/05/2019 9:07 am |
|---|---|

❐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 10/15/2019

*CLERK OF COURT*

OR

_______________________ /s/ Chris R. Miltenberger

*Signature of Clerk or Deputy Clerk* *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Toni Chaves, who issues or requests this subpoena, are:

Chris R. Miltenberger, 1360 N. White Chapel, Suite 200, chris@crmlawpractice.com, 817-416-5060

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**Exhibit A**

**Rider to Cricket Wireless Subpoena**

**CHAVES v. COGENT MEDICAL LABORATORY, LLC**
**Civil Action No. 5:19-cv-00861**

1. Any and all call detail records (inbound and outbound calls) from March 1, 2019 to present for the account listed for Toni Chaves, 11555 Culebra Road, Lot #73, San Antonio, Texas 78353, account number 358179320, mobile phone number 210-427-9562.
2. Any and all call detail records (inbound and outbound calls) from March 1, 2019 to present for mobile phone number 210-427-9562.

Submitted by:

______________________________

**Chris Miltenberger, Esq.**
Law Office of Chris R. Miltenberger, PLLC
1360 N. White Chapel Blvd., Suite 200
Southlake, Texas 76092
P: 817-416-5060
Cell: 817-296-0422
Fax: 817-416-5062

chris@crmlawpractice.com